# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP; COMMON CAUSE; MITZI REYNOLDS TURNER; DAWN DALY-MACK; HOLLIS BRIGGS; CORINE MACK; CALVIN JONES; JOAN CHAVIS; LINDA SUTTON; and SYENE JASMIN,<br><br>*Plaintiffs,*<br><br>*vs.*<br><br>PHILIP BERGER, in his official capacity as the President Pro Tempore of the North Carolina Senate; TIMOTHY MOORE, in his official capacity as the Speaker of the North Carolina House of Representatives; DESTIN HALL, in his official capacity as the Chair of the North Carolina House of Representatives Redistricting Committee; WARREN DANIEL, in his official capacity as Co-Chair of the North Carolina Senate Redistricting and Elections Committee; RALPH HISE, in his official capacity as Co-Chair of the North Carolina Senate Redistricting and Elections Committee; PAUL NEWTON, in his official capacity as Co-Chair of the North Carolina Senate Redistricting and Elections Committee; THE NORTH CAROLINA STATE BOARD OF ELECTIONS; ALAN HIRSCH, in his official capacity as the Chair of the State Board of Elections; JEFF CARMON, in his official capacity as the Secretary of the State Board of Elections; STACY EGGERS, in his official capacity as a member of the State Board of Elections; KEVIN N. LEWIS, in his official capacity as a member of the State Board of Elections; SIOBHAN O'DUFFY MILLEN, in her official capacity as a member of the State Board of Elections; KAREN BRINSON BELL, in her official capacity as the Executive Director of the State Board of Elections; THE STATE OF NORTH CAROLINA,<br><br>*Defendants.* | Civil Action No. 23 CV 1104<br><br><br>**<u>COMPLAINT</u>** |

1

Plaintiffs North Carolina State Conference of the NAACP and Common Cause (together, "Organizational Plaintiffs"), and Mitzi Reynolds Turner, Dawn Daly-Mack, Hollis Briggs, Corine Mack, Calvin Jones, Joan Chavis, Linda Sutton, and Syene Jasmin ("Individual Plaintiffs"), bring this civil rights action under 42 U.S.C. § 1983, the Fourteenth and Fifteenth Amendments of the United States Constitution, and the Voting Rights Act of 1965 ("VRA"), for declaratory and injunctive relief against Defendants Philip Berger, in his official capacity as the President Pro Tempore of the North Carolina Senate; Timothy Moore, in his official capacity as Speaker of the North Carolina House of Representatives; Destin Hall, in his official capacity as the Chair of the North Carolina House of Representatives Redistricting Committee; Warren Daniel, Ralph Hise, and Paul Newton, in their official capacities as the Co-Chairs of the North Carolina Senate Redistricting and Elections Committee; the North Carolina State Board of Elections; Alan Hirsch, in his official capacity as Chair of the State Board of Elections; Jeff Carmon, in his official capacity as Secretary of the State Board of Elections; Stacy Eggers, Kevin N. Lewis, and Siobhan O'Duffy Millen, all in their official capacities as Members of the State Board of Elections; Karen Brinson Bell, in her official capacity as Executive Director of the State Board of Elections; the State of North Carolina, and allege as follows:

## NATURE OF THE ACTION

1.  In 2023, the North Carolina General Assembly redrew its state legislative and congressional plans to severely diminish the voting power of North Carolina's Black voters, who comprise over 22% of residents in the state. The General Assembly achieved this by intentionally dismantling existing and longstanding Black opportunity districts and

2

diluting Black voting power in North Carolina's historic Black Belt, which stretches across the northeastern portion of the state, and by selectively targeting Black voters in other areas of the state. The effect of these actions is to inequitably reduce the electoral influence of the Black voters of North Carolina in violation of the Voting Rights Act and the United States Constitution.

2.      The General Assembly enacted the 2023 Senate Plan (S.L. 2023-146), 2023 House Plan (S.L. 2023-149), and 2023 Congressional Plan (S.L. 2023-145) (together, the "2023 Plans") using an intentionally rushed and deficient process that denied any opportunity for meaningful engagement and showed clear disregard for the interests, needs, and desires of North Carolina's Black voters.

3.      Of note, the General Assembly adopted redistricting criteria excluding any formal evaluation or consideration of race despite clear and recent instruction from this country's highest court in *Allen v. Milligan*, 143 U.S. 1487 (2023), requiring it. In *Milligan,* the Supreme Court confirmed that attention to Black voting power in areas with high Black populations during redistricting is crucial to ensuring compliance with the Voting Rights Act. *See* 143 U.S. at 1510 ("Section 2 itself 'demands consideration of race.'") (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2315 (2018)). This is particularly true in areas such as North Carolina's Black Belt that have, in recent years, included districts that allowed Black voters the opportunity to elect their candidates of choice.

4.      Because the General Assembly refused to conduct any evaluation of racial demography to ensure legal compliance with the Voting Rights Act and other mandates, the proposed redistricting plans unsurprisingly failed to meet those legal requirements. This

3

was evident from expert analysis provided to the General Assembly during the brief period between proposal and enactment of the 2023 Plans, which set forth evidence of legally significant racially polarized voting in several counties of North Carolina and showed at least one clear-as-day Voting Rights Act violation within the proposed senate plan.

5. Yet, even with that analysis in hand, the General Assembly defiantly refused to take any steps to address this Voting Rights Act violation or otherwise ensure legal compliance in the 2023 Plans. This refusal shows a predetermined unwillingness to comply with the requirements of the Voting Rights Act and significantly undercuts any prior representations made by the General Assembly that they intended to ensure equal opportunity for minority voters.

6. Moreover, none of these actions are defensible by the mere invocation of partisan motivation. As the Fourth Circuit made clear just seven years ago:

> Using race as a proxy for party may be an effective way to win an election. But intentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose. This is so even absent any evidence of race-based hatred and despite the obvious political dynamics. A state legislature acting on such a motivation engages in intentional racial discrimination in violation of the Fourteenth Amendment and the Voting Rights Act.

*N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 222–23 (4th Cir. 2016).

7. As set forth in this Complaint, the General Assembly targeted predominantly Black voting precincts with surgical precision throughout the state in drawing and enacting the 2023 Plans, at the expense of traditional redistricting criteria, to achieve preferred district lines that diminish Black voters' ability to elect candidates of their choice at all levels of government.

4

## JURISDICTION AND VENUE

8.      Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988, and 52 U.S.C. § 10101(d), to redress the deprivation under color of state law of rights secured by the United States Constitution and the Voting Rights Act of 1965.

9.      This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343 because this case arises under the U.S. Constitution and the laws of the United States and seeks equitable and other relief for the deprivation of constitutional and federal statutory rights under color of state law.

10.      A three-judge district court is requested pursuant to 28 U.S.C. § 2284(a), as Plaintiffs' action challenges "the constitutionality of the apportionment of congressional districts" and the "constitutionality of the apportionment of a statewide legislative body."

11.      This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

12.      This Court has jurisdiction to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

13.      Venue is proper in this Court under 28 U.S.C. § 1391(b).

## PARTIES

*Plaintiffs*

14.      Plaintiff North Carolina State Conference of the NAACP ("North Carolina NAACP") is a nonpartisan, non-profit organization composed of more than 100 branches and 20,000 members throughout the state of North Carolina, including every county in North Carolina. The mission of the North Carolina NAACP is advancing the social and

Case 1:23-cv-01104   Document 1   Filed 12/19/23   Page 5 of 87

political rights of Black people and all persons of color by advocating for policies and practices that eliminate discrimination. Central to this mission is fostering civic engagement and ensuring that people of color are represented at all levels of government by legislators who share their interests, values, and beliefs, and who will be accountable to the community. To this end, the North Carolina NAACP facilitates nonpartisan voter registration drives to promote civic participation and has engaged in redistricting-related advocacy.

15.     As relevant to the claims in this Complaint, North Carolina NAACP has members who identify as Black or African American and are registered voters in 2023 Senate Plan districts 1, 2, 8 & 41; 2023 House Plan districts 5, 8, 9, 10, 12, 23, 24, 25, 27, 32 & 71; and 2023 Congressional Plan districts 1, 3, 5, 6 & 10. This includes members who identify as Black or African American and are registered voters in the following counties: Vance County; Warren County; Halifax County; Northampton County; Hertford County; Gates County; Pasquotank County; Bertie County; Nash County; Wilson County; Edgecombe County; Martin County; Pitt County; Greene County; Lenoir County; Wayne County; New Hanover County; Mecklenburg County; Wake County; and Forsyth County.

16.     Plaintiff Common Cause is a nonpartisan, non-profit organization with over 1.5 million members nationwide and staff in 31 states, including North Carolina. The mission of Common Cause centers around fair elections and encouraging a more representative, open, and responsive government. As part of that mission, Common Cause has educated members and the public about the redistricting process, including how to participate, monitor, and hold decision-makers accountable. Common Cause has

researched state redistricting practices to identify best practices for creating a legal, transparent, responsive, and equitable redistricting process. It also assists voters in navigating the elections process, provides resources to help voters determine their districts and polling places, and mobilizes voters to engage in advocacy for government accountability.

17.     As relevant to the claims in this Complaint, Common Cause has members who identify as Black or African American in 2023 Senate Plan districts 1, 2, 8, 38, 39 & 41; 2023 House Plan districts 5, 7, 8, 9, 10, 12, 23, 24, 25, 27, 32, 37, 71 & 75; and 2023 Congressional Plan districts 1, 3, 5 & 6. This includes members who identify as Black or African American and are registered voters in the following counties: Vance County; Warren County; Halifax County; Northampton County; Hertford County; Gates County; Pasquotank County; Bertie County; Nash County; Wilson County; Edgecombe County; Martin County; Pitt County; Greene County; Lenoir County; Wayne County; New Hanover County; Mecklenburg County; Wake County; and Forsyth County.

18.     Plaintiff Calvin Jones is a Black citizen of the United States and of the State of North Carolina, and a resident of Norlina in Warren County and member of the Warren County NAACP. Mr. Jones's residence is within Senate District 2, House District 27, and Congressional District 1 under both the 2023 Plans and the prior plans used in the 2022 election. Mr. Jones is a registered voter who has regularly voted in the past and intends to vote in the future.

19.     Plaintiff Corine Mack is a Black citizen of the United States and of the State of North Carolina, and a resident of Charlotte in Mecklenburg County and Branch President

7

of the Mecklenburg NAACP. Ms. Mack's residence is within Senate District 41 in the 2023 Senate Plan and the state senate plan used in the 2022 general election ("the 2022 Senate Plan"). Ms. Mack is a registered voter who has regularly voted in the past and intends to vote in the future.

20.     Plaintiff Dawn Daly-Mack is a Black citizen of the United States and of the State of North Carolina, and a resident of Gaston in Northampton County and Branch President of the Northampton NAACP. Ms. Daly-Mack's residence is within Senate District 1, House District 27, and Congressional District 1 under the 2023 Plans and Senate District 3, House District 27, and Congressional District 1 under the prior plans used in the 2022 election. Ms. Daly-Mack is a registered voter who has regularly voted in the past and intends to vote in the future.

21.     Plaintiff Hollis Briggs is a Black citizen of the United States and of the State of North Carolina, and a resident of Wilmington in New Hanover County and a member of the NAACP. Mr. Briggs's residence was within Senate District 7 under the 2022 Senate Plan and is now in State Senate District 8 under the 2023 Senate Plan. Mr. Briggs is a registered voter who has regularly voted in the past and intends to vote in the future.

22.     Plaintiff Mitzi Reynolds Turner is a Black citizen of the United States and of the State of North Carolina, and a resident of High Point in Guilford County and member of the NAACP and Common Cause. Ms. Turner's residence is within Congressional District 6 under both the 2023 Congressional Plan and the congressional plan used in the 2022 election (the "2022 Congressional Plan"). Ms. Turner is a registered voter who has regularly voted in the past and intends to vote in the future.

8

23.     Plaintiff Joan Chavis is a Black citizen of the United States and of the State of North Carolina, and a resident of Fuquay-Varina in Wake County. Ms. Chavis's residence is within House District 37 under both the 2023 House Plan and the state house plan used in the 2022 election (the "2022 House Plan"). Ms. Chavis is a registered voter who has regularly voted in the past and intends to vote in the future.

24.     Plaintiff Linda Sutton is a Black citizen of the United States and of the State of North Carolina, and a resident of Winston-Salem in Forsyth County and member of the NAACP. Ms. Sutton's residence is within House District 71 under both the 2023 House Plan and the 2022 House Plan. Ms. Sutton is a registered voter who has regularly voted in the past and intends to vote in the future.

25.     Plaintiff Syene Jasmin is a Black citizen of the United States and of the State of North Carolina, and a resident of Winterville in Pitt County and member of the NAACP. Mr. Jasmin's residence was located in Congressional District 1 under the 2022 Congressional Plan and is now in Congressional District 3 under the 2023 Congressional Plan. Mr. Jasmin's residence is located within Senate District 5 and House District 9 under both the 2023 Plans and those used in the 2022 election. Mr. Jasmin is a registered voter who has regularly voted in the past and intends to vote in the future.

*Defendants*

26.     Defendant Philip Berger is a member of the North Carolina Senate, having been elected to that office by the voters residing in District 26. Mr. Berger serves as the President Pro Tempore of the North Carolina Senate. Mr. Berger is sued in his official capacity.

9

27.     Defendant Timothy Moore is a member of the North Carolina House of Representatives, having been elected to that office by the voters residing in District 111. Mr. Moore serves as the Speaker of the North Carolina House of Representatives. Mr. Moore is sued in his official capacity.

28.     Defendant Destin Hall is a member of the North Carolina House of Representatives, having been elected to that office by the voters residing in District 87. Mr. Hall serves as the Chair of the House Redistricting Committee. Mr. Hall is sued in his official capacity.

29.     Defendant Warren Daniel is a member of the North Carolina Senate, having been elected to that office by the voters residing in District 46. Mr. Warren serves as a Co-Chair of the Senate Redistricting and Elections Committee. Mr. Warren is sued in his official capacity.

30.     Defendant Ralph Hise is a member of the North Carolina Senate, having been elected to that office by the voters residing in District 47. Mr. Hise serves as a Co-Chair of the Senate Redistricting and Elections Committee. Mr. Hise is sued in his official capacity.

31.     Defendant Paul Newton is a member of the North Carolina Senate, having been elected to that office by the voters residing in District 34. Mr. Newton serves as a Co-Chair of the Senate Redistricting and Elections Committee. Mr. Newton is sued in his official capacity.

32.     Defendant North Carolina State Board of Elections is the agency responsible for the administration of the election laws of the State of North Carolina.

33.     Defendant Alan Hirsch is the Chair of the North Carolina State Board of Elections. Mr. Hirsch is sued in his official capacity.

34.     Defendant Jeff Carmon is the Secretary of the North Carolina State Board of Elections. Mr. Carmon is sued in his official capacity.

35.     Defendant Stacy Eggers is a Member of the North Carolina State Board of Elections. Mr. Eggers is sued in his official capacity.

36.     Defendant Kevin N. Lewis is a Member of the North Carolina State Board of Elections. Mr. Lewis is sued in his official capacity.

37.     Defendant Siobhan O'Duffy Millen is a Member of the North Carolina State Board of Elections. Ms. O'Duffy Millen is sued in her official capacity.

38.     Defendant Karen Brinson Bell is the Executive Director of the North Carolina State Board of Elections. Ms. Brinson is sued in her official capacity.

## STATEMENT OF FACTS

**I.     Redistricting Requirements in North Carolina.**

39.     The North Carolina Constitution requires the General Assembly to revise legislative districts for the state senate and state house at "the first regular session convening after the return of every decennial census." N.C. Const. art. II, §§ 3, 5. This power is subject to limitations under both state and federal law, including federal one-person, one-vote requirements and the Voting Rights Act, as recognized in the supremacy clauses in Article I, Sections 3 and 5 of the North Carolina Constitution.

40.     The construction of state legislative districts in North Carolina is governed by the Whole County Provision of the North Carolina Constitution. The Whole County

11

Provision requires that "no county shall be divided in the formation of a senate district," as well as that "no county shall be divided in the formation of a representative district." N.C. Const. art. II, §§ 3(3), 5(3). The construction of congressional districts in North Carolina is not bound by the requirements of the Whole County Provision of the North Carolina Constitution.

41.     The Whole County Provision of the North Carolina Constitution, as construed by the North Carolina Supreme Court in *Stephenson v. Bartlett*, 355 N.C. 354 (2002) ("*Stephenson I*") and its progeny, governs the formation of the county clusters to be used in North Carolina state legislative plans.

42.     *Stephenson* requires that where a county can support a single state house or senate district, or multiple such districts, on its own, that number of districts should be drawn entirely within that county. But *Stephenson* also holds that where whole counties cannot, on their own, support the creation of a single state house or senate district, "the requirements of the WCP [Whole County Provision] are met by *combining or grouping the minimum number of whole, contiguous counties* necessary to comply with the at or within plus or minus five-percent 'one-person, one vote' standard." *Harper v. Hall*, 384 N.C. 292, 335 (2023) ("*Harper III*") (quoting *Stephenson I*, 355 N.C. at 383-84) (emphasis in original).

43.     Importantly, the *Stephenson* cases "harmonized federal redistricting requirements and the directives of [the] state constitution[.]" *Harper III*, 384 N.C. at 336. It delineated the interplay between federal law and the Whole County Provision by specifying: "to ensure full compliance with federal law, legislative districts required by the

VRA shall be formed *prior to* creation of non-VRA districts." *Id.* at 371 (quoting *Stephenson I*, 355 N.C. at 383) (emphasis added).

44.    Redistricting undertaken by the General Assembly is subject to Section 2 of the Voting Rights Act. Section 2 provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or [membership in a language minority group] as provided in subsection (b).

> (b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice. The extent to which members of a protected class have been elected to office is but one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301.

45.    Section 2 of the Voting Rights Act prohibits, *inter alia*, the use of redistricting plans that "minimize or cancel out the voting strength of racial [minorities in] the voting population." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) (internal citations and quotation marks omitted). In this way, Section 2 imposes a "permanent, nationwide ban on racial discrimination in voting." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 557 (2013).

46.    A violation of Section 2 can be established by proving (i) the challenged voting standard, practice or procedure was adopted, at least in part, with a discriminatory

13

intent, or (ii) "by proof of discriminatory results alone." *Chisom v. Roemer*, 501 U.S. 380, 404 (1991); *see also id.* at 394 n.21.

47. In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court construed Section 2 to prohibit the "dispersal of a [minority] group's members into districts in which they constitute an ineffective minority of voters." *Cooper v. Harris*, 581 U.S. 285, 292 (2017) (alteration adopted) (quoting *Gingles*, 478 U.S. at 46 n.11). When "minority and majority voters consistently prefer different candidates" in such districts, "the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters," thus depriving minorities of an equal opportunity to elect representatives of their choice. *Gingles*, 478 U.S. at 48.

48. "To succeed in proving a § 2 violation under *Gingles,* plaintiffs must first satisfy three 'preconditions.'" *Allen v. Milligan,* 599 U.S. 1, 143 S. Ct. 1502, 1503 (2023) (quoting *Gingles*, 478 U.S. at 50); *Wis. Legislature v. Wisc. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022). First, the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district that comports with traditional redistricting criteria. *Milligan*, 143 S. Ct. at 1503. "Second, the minority group must be able to show that it is politically cohesive." *Id.* (quoting *Gingles*, 478 U. S., at 51). "And third, 'the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate.'" *Id.* (quoting *Gingles*, 478 U. S. at 51). Each precondition must be met for the claim to succeed. *Cooper*, 581 U.S. at 306. Having met these three preconditions, the plaintiff must show that, under the "totality of circumstances," the "political process is [not] equally open to

14

minority voters" without a different district or districts. *Wis. Legislature*, 142 S. Ct. at 1248 (quoting *Gingles*, 478 U.S. at 79).

## II.    Discriminatory Redistricting in North Carolina.

49.    "Unquestionably, North Carolina has a long history of race discrimination generally and race-based vote suppression in particular." *McCrory*, 831 F.3d at 223. As observed by scholar Robert N. Hunter, Jr. over 30 years ago, "the history of official voting discrimination [has] lasted for over 120 years in North Carolina," supported by the "continual resort to unfair election mechanisms designed by a majority to insure [sic] electoral success." Robert N. Hunter Jr., *Racial Gerrymandering and the Voting Rights Act in North Carolina*, 9 CAMPBELL L. REV. 255, 261 (1987). Importantly, Mr. Hunter found that the history of unfair election mechanisms in North Carolina relied upon "devices that may appear to have been racially or partisanly neutral, [but] their implementation was not." *Id.*

50.    That pattern has regrettably continued in the decades since. The hallmark of North Carolina redistricting since the 2010 Census has been the General Assembly's repeated misinterpretation and circumvention of legal requirements in redrawing state and congressional districts to diminish the voting power of Black voters.

51.    Following the release of the 2010 Census, the chairs of the House and Senate Redistricting Committees, Senator Robert Rucho and Representative David Lewis, engaged demographer Dr. Thomas Hofeller as private counsel to redraw state and congressional plans. *Covington v. North Carolina*, 316 F.R.D. 117, 168 (M.D.N.C. 2016), *aff'd* 137 S. Ct. 2211 (2017); *Cooper v. Harris*, 581 U.S. 285 (2017).

15

52.     For the state senate and house plans, Senator Rucho and Representative Lewis instructed Dr. Hofeller to draw 50%+1 Black voting age population ("BVAP") districts wherever possible, which they then "claimed were necessary for compliance with the VRA." *Covington*, 316 F.R.D. at 127. They claimed to implement this approach to comply with *Gingles,* based upon a general, statewide determination that there was statistically significant racially polarized voting throughout North Carolina. *Id.* at 171 & n.52. This was done without examination of its impact on election results in specific areas and districts. *Id.*

53.     However, when the redistricting plan was challenged, "[i]t was revealed at trial that the Redistricting Chairs misconstrued what the third *Gingles* factor requires." *Covington*, 316 F.R.D. at 168. "[T]he Redistricting Chairs testified that they never made any determination whether majority bloc voting existed at such a level that the candidate of choice of African-American voters would usually be defeated without a VRA remedy." *Id.* at 168.

54.     Ultimately, the district court ruled that 28 state house and senate districts drawn after the 2010 census were unconstitutional racial gerrymanders. *Covington*, 316 F.R.D. at 176, *aff'd North Carolina v. Covington*, 137 S. Ct. 2211 (2017). As a result, the district court ordered the North Carolina General Assembly to remedy those districts. *Id.* In reaching its conclusion, the district court noted that the "[Covington] Plaintiffs, and thousands of other North Carolina citizens, . . . suffered severe constitutional harms stemming from Defendants' creation of twenty-eight districts racially gerrymandered in violation of the Equal Protection Clause." *Id.* at 177.

16

55.    The North Carolina General Assembly drew remedial maps in 2017 with Senator Ralph Hise and Representative David Lewis at the helm of the Senate and House Redistricting Committees, respectively. However, Black voters were drawn into several new districts that continued to be racially gerrymandered. This ultimately required the district court to adopt a special master's map for four state house and senate districts to remedy the racial gerrymandering depriving Black voters of an equal opportunity to elect their candidates of choice. *Covington v. North Carolina*, 283 F. Supp. 3d 410, 442 (M.D.N.C. 2018), *aff'd North Carolina v. Covington*, 138 S. Ct. 2548, 2554 (2018).

56.    Two of North Carolina's congressional districts were also overturned later in 2017 by the Supreme Court, in *Cooper v. Harris*, when the Court found that the North Carolina General Assembly had racially gerrymandered Congressional Districts 1 and 12. 581 U.S. 285, 294–96 (2017). These districts consisted of geographic areas, including portions of North Carolina's Black Belt falling in Congressional District 1, that had been targeted by the General Assembly for over 20 years. *Id.*

57.    The Supreme Court found in *Cooper* that state mapmakers set a "racial target" that Black voters should make up more than 50% of the voting age population of Congressional Districts 1 and 12 without performing the requisite analysis to justify this under the Voting Rights Act. *Cooper*, 581 U.S. at 299, 302–03, 312–13. In pursuing this approach, the Court held that the General Assembly misconstrued the third *Gingles* factor to the detriment of Black voters. *Id.*

58.    In defending their voting plan, the defendants in *Cooper* claimed that they performed strictly political gerrymanders without regard to race. Yet, the *Cooper* Court, in

reviewing the trial evidence, concluded that "race, not politics, accounted for [District 12's] reconfiguration," *id.* at 311, despite the defendants' argument that the "mapmakers drew their lines … to 'pack' District 12 with Democrats, not African-Americans." *Id*. at 308. The Supreme Court noted, in particular, the district court's finding that the "denial of race-based districting" by the defendants' mapmaker "r[ang] hollow." *Id.* at 315 (citing *Harris v. McCrory*, 159 F. Supp.3d 600, 620, n.8 (M.D.N.C. 2016)). And the Supreme Court issued a caution with respect to the interplay of the Voting Rights Act and partisanship, admonishing that "if legislators use race as their predominant districting criterion with the end goal of advancing their partisan interests—perhaps thinking that a proposed district is more 'sellable' as a race-based VRA compliance measure than as a political gerrymander and will accomplish much the same thing—their action still triggers strict scrutiny." *Id.* at 308 n.7.

59. Other challenges were brought to the General Assembly's redistricting in the aftermath of the *Covington* and *Cooper* decisions. But even after the Supreme Court found the General Assembly's failure to perform a proper Voting Rights Act analysis (and determination to instead pack Black voters by drawing majority-minority districts wherever possible) unlawful, the General Assembly did not prioritize analysis of what the Voting Rights Act requires in future redistricting cycles.

60. Instead, the General Assembly shifted tacks, contending that *Covington* and *Cooper* stood for the proposition that the *Gingles* preconditions could no longer be satisfied anywhere in North Carolina. They repeatedly asserted in revising district lines that the Voting Rights Act now did not impose any restrictions or obligations on the General

Assembly's redistricting going forward. Yet, this interpretation of the law was explicitly and repeatedly *rejected* by the Supreme Court. *See, e.g.*, *Covington,* 316 F.R.D. at 178 ("Evidence of a potential Section 2 violation may exist in some parts of the state, and if such evidence is <u>properly</u> examined and demonstrated, it certainly could justify future majority-minority districts." (emphasis in original)); *Cooper*, 581 U.S. at 304 ("[A] legislature undertaking a redistricting must assess whether the new districts it contemplates (not the old ones it sheds) conform to the VRA's requirements.").

61.     In the 2017 redistricting process, for example, legislative leaders "asserted that the reason they were ignoring racial considerations entirely in drawing the new districts was because they had concluded that the 'third *Gingles* factor' was not 'present' anywhere in the State of North Carolina." *Common Cause v. Lewis*, No. 18CVS014001, 2019 N.C. Super. LEXIS 56, at *313 (Super. Sept. 3, 2019). But later, as defendants in the ensuing lawsuit, they claimed they sought to "satisfy" the Voting Rights Act as a legal defense, an excuse the court determined "does not make sense as a legal or factual matter" given their assertions during the redistricting process. *Common Cause v. Lewis*, 2019 N.C. Super. LEXIS 56, at *313. The *Lewis* court found that the General Assembly was manipulating the requirements of the Voting Rights Act. *Id.* at *316 (holding that the Voting Rights Act neither justified the districts drawn by the General Assembly nor formed the actual motivation for the General Assembly in drawing them). In rejecting the General Assembly's efforts to manipulate the Voting Rights Act for partisan gain at the expense of Black voters, the *Lewis* court expressly required that "remedial maps must comply with the VRA." *Id.* at *407–09.

19

62. These decisions from multiple courts—federal and state—demonstrate two truths about North Carolina's 2010 redistricting cycle. First, the General Assembly's process for state legislative districts and federal congressional districts consistently ran afoul of both the United States Constitution and its protections against racial discrimination and the North Carolina Constitution. And second, the General Assembly consistently misconstrued the requirements of the Voting Rights Act, often in contradiction of their own previously stated positions, for the purpose of disadvantaging Black North Carolinians in the electoral process.

63. Outside of the redistricting context, but during this same period in the 2010s, the General Assembly was found to have intentionally discriminated against African American voters by targeting them with "almost surgical precision" in an omnibus election bill. *McCrory*, 831 F.3d at 214. In its decision, the Fourth Circuit rejected a defense that the legislative majority had mere partisan intent, noting that the General Assembly had used the discriminatory omnibus election bill to "entrench itself," enacting it with "knowledge that African Americans voting translated into support for one party" and thus "targeting voters who, based on race, were unlikely to vote for the majority party." *Id.* at 233. "Even if done for partisan ends, that constituted racial discrimination." *Id.*

## III. Redistricting After the Release of the 2020 Census.

64. The U.S. Census Bureau released its 2020 Census results in August 2021. With the Census results available, the North Carolina General Assembly set out to meet its constitutional mandate to redraw all three of the statewide voting maps: a congressional

Case 1:23-cv-01104   Document 1   Filed 12/19/23   Page 20 of 87

map with 14 congressional districts (an increase of one since the 2010 Census); a state house map with 120 house districts; and a state senate map with 50 senate districts.

65.     The 2021 redistricting cycle picked up where the 2011 redistricting cycle had left off: with the General Assembly misapplying the requirements of the U.S. Constitution and the Voting Rights Act to target Black voters' political power.

66.     The House Redistricting Committee and the Senate Redistricting and Elections Committee (together, the "Redistricting Committees") again claimed to pursue a "race-blind" approach at the outset of its redistricting process. The Committee Chairs proposed a set of redistricting criteria that purported to prohibit the use of "[d]ata identifying the race of individuals or voters" in the drawing or consideration of congressional and state legislative maps. *Harper I*, 380 N.C. at 327. With this criterion, the Chairs of the Redistricting Committees orchestrated a process that would fail to do any Voting Rights Act-related analysis prior to drawing or enacting district lines. The process also obstructed the ability of individual legislators to formally analyze and consider whether proposed district lines would comply with the Voting Rights Act. This approach violated the clear requirement to draw VRA-required districts first, as mandated by *Stephenson*.

67.     During the subsequent public comment period and committee debate, citizens and several legislators strenuously objected to the alleged "race-blind" criteria and urged adoption of amended criteria to allow for consideration of racial data as required by the Voting Rights Act. *Id.*

68.     For example, Senate Minority Leader Dan Blue Jr. warned that a failure to consider racial data would contravene Supreme Court precedent in *Cooper* and *Covington*, and that it would "cost the taxpayers another 10 to 20 million dollars defending [race-blind redistricting] back up through . . . the Supreme Court." NCGA Redistricting, *2021-08-12 Committee (Joint)* (Aug. 12, 2021).[1] He proposed an amendment to the redistricting criteria providing that "African-Americans shall not be packed into any groupings or district to give partisan advantage to any political party." *See* Amendment to Proposed Criteria – Voting Rights Act Offered by Senator Blue, North Carolina Joint Redistricting Committees, Aug. 12, 2021, 2021–2022 Session (N.C. 2021).[2] The amendment was rejected.

69.     What's more, this refusal to even consider racial data, let alone draw VRA districts where examination of demographic and voting information would require it, again contradicted the General Assembly's past position on the issue. In the course of the *Covington* litigation, the General Assembly "interpreted [the *Stephenson*] cases to require that VRA districts be drawn before all other districts." *Covington*, 316 F.R.D. at 132 n.12. This understanding of the *Stephenson* cases would later be reaffirmed in *Harper III*: "if Section 2 requires VRA districts, those districts must be drawn first so that the remaining non-VRA districts can be drawn in compliance with the WCP." 384 N.C. at 371.

70.     Nonetheless, the Redistricting Committees rejected Senator Blue's proposal, along with all other proposals to consider racial data, and abandoned their own prior

---

[1] Available at https://youtu.be/gSm2OhE7Slk?si=oD8a4ZwUV0ou4o3 at 3:35:00.
[2] Available at https://ncleg.gov/documentsites/committees/Senate2021-154/2021/08-12-2021/Proposed%20Amendments/Voting%20Rights%20Act.Amendment.pdf.

22

interpretation of *Stephenson* as raised in defending claims in the *Covington* litigation. As a result, on August 12, 2021, the Redistricting Committees adopted an allegedly race-neutral list of final criteria for redistricting. The final criteria for redistricting thus made no exception to permit the use of racial data to assess the potential for vote dilution or compliance with the Voting Rights Act. The Redistricting Committees took this approach despite having been warned, only two years earlier by the *Lewis* court, of the importance of compiling evidence relevant to the racial composition of districts for purposes of complying with the Voting Rights Act and other federal requirements.

71. The General Assembly sharply limited public participation in the subsequent lead-up to the map-drawing process. Only 13 public hearings were held before map-drawing began, as compared to more than 60 hearings held in the 2011 redistricting cycle.

72. Of the limited public hearings conducted, several were ineffectively noticed, further reducing the already-limited opportunity for public comment. For example, the Redistricting Committees provided the wrong location information in the notice for the September 8, 2021 hearing in Caldwell County, telling the public it was to be held at Caldwell County Community College when it was actually held miles away at the JE Broyhill Civic Center. There was low turnout at this hearing, and several individuals who had signed up to speak did not appear when called.

73. Despite the *Lewis* court's admonition that a redistricting process must be conducted "in full public view," the 2021 map-drawing process suffered from serious lapses in transparency.

23

74.    For example, the Redistricting Chairs represented that each new map would be drawn in public view, on public computer terminals, and without access to political data. But subsequent litigation revealed that legislators responsible for drawing the maps relied on secret, pre-drawn maps. *Harper I*, 380 N.C. at 328.

75.    Evidence in the *Harper* litigation demonstrated that, between sessions at the public computer terminals, Representative Destin Hall—who "personally drew nearly all of the House map [later] enacted[,]"—held meetings in a "private room adjacent to the public map-drawing room[,]" where he and others viewed "concept maps" created on an unknown computer and using unknown software and data. *Id.* Representative Hall then surreptitiously relied upon these "concept maps" when he sat at the public terminals to draw proposed voting plans.

76.    The "concept maps" were subsequently destroyed. *Id.* at 328 n.5. As a result, they were never produced in the ensuing litigation challenging the 2021 voting plans or otherwise made available for public review.   Representative Hall and Senator Ralph E. Hise, Jr., one of the Chairs of the Senate Redistricting Committee, confirmed that no affirmative restrictions on the use of outside maps were ever implemented or enforced during the redistricting process. *Id.* at 328.

77.    In November 2021, the new state house, state senate, and congressional maps passed along strict party lines, within only a week of being publicly proposed.

78.    All three maps were challenged in state court shortly after they became law. Following a week-long trial in January 2022, a three-judge panel of the Superior Court found that the North Carolina General Assembly intentionally drew extreme partisan

gerrymanders designed to entrench Republican dominance in North Carolina's General Assembly and its congressional delegation. *See North Carolina League, of Conservation Voters, Inc. v. Hall*, No. 21 CVS 015426, 2022 WL 124616 (N.C. Super. Jan. 11, 2022).

79.     Despite finding intentional and extreme partisan gerrymandering in the drafting of new districts, the trial court nevertheless denied relief, reasoning that the partisan gerrymandering claims "amounted to political questions that are nonjusticiable under the North Carolina Constitution." *Harper I*, 380 N.C. at 348.

80.     Upon appeal in early 2022, the North Carolina Supreme Court reversed, holding that the General Assembly violated state law "beyond a reasonable doubt" by enacting maps that constituted partisan gerrymanders. *Id.* at 353. It also rejected the trial court's conclusion that partisan gerrymandering claims present a nonjusticiable political question. *Id.* After holding that the 2021 districting maps "substantially infringe upon plaintiffs' fundamental right to equal voting power," the court struck down the maps and remanded the case to the trial "court to oversee the redrawing of the maps by the General Assembly or, if necessary, by the court." *Id.* at 403.

81.     Legislators enacted three new remedial maps in February 2022. While the remedial state house map was drafted and passed in a bipartisan process, the remedial state senate and remedial congressional maps were drafted and passed along partisan lines. The remedial congressional map proposed by the General Assembly was then rejected as not compliant with *Harper I*. The court's appointed special masters then modified the General Assembly's congressional plan only to the extent necessary to remedy the constitutional defects identified by the court.

82.     The North Carolina Supreme Court held in December 2022 that the remedial state senate map was still unconstitutionally gerrymandered and ordered it to be redrawn. *Harper v. Hall*, 383 N.C. 89, 125 (2022), *reh'g granted*, 384 N.C. 1 (2023), and *opinion withdrawn and superseded on reh'g*, 384 N.C. 292 (2023).

83.     In February 2023, a newly composed North Carolina Supreme Court agreed to rehear the *Harper* case, along with a voter ID case. This represented a virtually unprecedented decision by the court to revisit decisions issued in the prior term. In April, the court vacated its prior decision outlawing partisan gerrymandering in North Carolina. *Harper v. Hall*, 384 N.C. 292, 379 (2023) (*Harper III*). In doing so, the court granted legislators' request to redraw all three voting plans, i.e., for state senate and state house districts and for federal congressional districts. *Id.* at 378.

### IV.     The 2023 Redraw.

84.     The North Carolina Supreme Court issued its order allowing for the statewide redrawing of districts in April of 2023, and soon after, legislative leadership announced an intent to redraw district lines. *See* Press Release, SPEAKERMOORE.COM (Apr. 28, 2023) ("We will fulfill our constitutional duty to redraw state house, senate and congressional maps.").[3] Legislative leaders nevertheless waited for nearly *five months* to begin the public redistricting process.

85.     There was no reasonable basis offered by state legislators to delay the redistricting process for five months. However, the delay had the practical effect of limiting

---

[3] Available at https://speakermoore.com/category/press-releases/page/2/.

the public's opportunity to participate in the process, including by identifying deficiencies in the proposed voting plans. It also had the legal effect of severely limiting the time to ensure legality of the final voting plans prior to the 2024 statewide elections in North Carolina.

86.     On the afternoon of September 18, 2023, the Senate Committee on Redistricting on Elections first noticed three public meetings addressing redistricting for the following week: a September 25 meeting at the College of Albemarle in Elizabeth City; a September 26 meeting at the Hickory Campus of Appalachian State University; and a September 27 meeting at the Legislative Office Building in Raleigh (the "Three September Hearings").

87.     Upon information and belief, at least some local legislative leadership was not informed in advance that the Three September Hearings would be scheduled in their areas or consulted on the manner in which they would be held. Upon information and belief, members of the state House were not consulted at all on the scheduling or location of the hearings.

88.     Senate leadership scheduled all Three September Hearings during business hours, at 4:00pm in the afternoon. Public notices for all three meetings provided links for members of the public to sign up to speak but specified that "Committee members are not required to attend," which was highly unusual for a hearing of a legislative committee.[4]

---

[4] *See, e.g.*, https://www.ncleg.gov/Committees/NoticeDocument/6424/Redistricting%20Agenda.

89.     In the notices and public agendas for the Three September Meetings, the only disclosed purpose of the meetings was "to gather public comment for the 2023 redistricting process," without any further information. *See supra*, n.4. No additional information was provided, including no information on what, if any, redistricting criteria would be used to redraw congressional or state legislative districts, what criteria the public should use if submitting community maps, the reasons that the Redistricting Committees, legislative leadership, or anyone else felt it was necessary to redraw districts, any anticipated or planned timeline for the redistricting process, or any draft voting plans being considered by the General Assembly.

90.     For decades, North Carolina law has ensured transparency by providing that redistricting records generated by the General Assembly must be preserved and made available to the public upon request. This transparency came to an abrupt end during the 2023 redistricting process. On September 22, 2023, the General Assembly ratified House Bill 259, the 2023 Appropriations Act.[5] Buried within the 625-page budget, the General Assembly included a one-line provision repealing North Carolina General Statute § 120-133, which, since its enactment in 1983, had designated certain redistricting records public when the act establishing the relevant district plan was ratified (1983−1993) or became law (1993−2023). *See* H259-PCCS50044-MHxr-6 at p. 530 (Section 27.7(d) "G.S. 120-133 is repealed").

---

[5] *See* https://www.ncleg.gov/BillLookup/2023/H259.

Case 1:23-cv-01104   Document 1   Filed 12/19/23   Page 28 of 87

91.    House Bill 259 was originally filed on March 2, 2023, and competing versions were debated and passed in the House and Senate in April and May of 2023 (respectively), after which the bill lay dormant for four months while the House and Senate worked to reconcile differences in their budget proposals.[6] The versions passed by the House (in April) and the Senate in (May) did not have any provisions repealing § 120-133. Instead, this provision was added to the Proposed Conference Committee Substitute version filed on the evening of September 20, 2023, and ratified at lightning speed just two days later, on September 22, 2023.  In adopting the final bill, no explanation was provided for why redistricting records could no longer remain public as they had been for four decades.

92.    The 2023 Appropriations Act also made dramatic changes to North Carolina's public records law overall that further threaten the transparency of the redistricting process. For example, in Section 27.9, the law amended N.C. Gen. Stat. § 121-5 to provide custodians of General Assembly records the power to independently decide if a record is public instead of following specified retention schedules. If a custodian determines a record is not public, they can unilaterally choose to "destroy, sell, loan, or otherwise dispose of" the record. N.C. Gen. Stat. § 121-5(d1). And in Section 27.7(e), the law was amended to provide that a legislator "shall not be required to reveal or to consent to reveal any document, supporting document, drafting request, or information request made or received by that legislator while a legislator." N.C. Gen. Stat. § 120-135(b).

---

[6] *See* https://www.ncleg.gov/BillLookup/2023/H259.

29

93.    On or about September 23, 2023, the North Carolina General Assembly posted a public comment portal for redistricting.[7] This portal stated that "The House Redistricting Committee and Senate Redistricting and Elections Committee are accepting public comments on House, Senate, and Congressional district plans." Like the earlier meeting notices, it did not include more information, including by when public comment would have to be submitted in order to be considered by the Redistricting Committees.

94.    On September 25, 2023, a group of more than 50 non-partisan civil society organizations issued a public letter to the Joint Redistricting Committees and legislative leadership calling for an inclusive and transparent redistricting process providing robust opportunity for public input. The letter specified that such a process should include a redistricting timeline providing for accessible public hearings to allow for informed public comment, held before and after publication of draft maps and held at times outside traditional business hours to allow working voters to attend. The letter also noted the harm to public confidence that was caused by the secret concept maps used in 2021 and the General Assembly's failure to follow its own purported criterion of not considering partisan data.

95.    Substantial numbers of the Redistricting Committees' members were absent from the Three September Hearings. For example, upon information and belief:

96.    Representative Pricey Harrison was the sole House Redistricting Committee member to attend the September 25 hearing presided over by Defendant Newton; the 14

---

[7] *See* https://www.ncleg.gov/RequestForComments/45.

remaining House committee members, three vice-chairs, and Chair (Defendant Hall) were all absent. Senator Sanderson was the sole Senate committee member to attend; the 12 remaining Senate committee members and two other chairs were all absent. Senator Kandie Smith, who is Black and represents Senate District 5 comprised of Edgecombe and Pitt Counties, and Representative Bill Ward, who is white and represents House District 5 comprised of Camden, Gates, Hertford, and Pasquotank Counties, also attended.

97.    Only a fraction of the 15 House committee members and 13 Senate committee members attended the September 26 hearing presided over by Defendant Daniel; no other Co-Chairs attended.

98.    Only Defendant Hall and a fraction of the 15 House Redistricting Committee members and 13 Senate Redistricting and Elections Committee members attended the September 27 hearing presided over by Defendant Hise.

99.    In the public comment provided in each of the Three September Hearings, speakers overwhelmingly spoke against gerrymandering of any kind and spoke in favor of plans that would provide equal voice to North Carolina's communities.[8] Several speakers noted in particular the importance of considering race in redrawing any lines to protect minority voters against vote dilution in violation of the Voting Rights Act, especially in light of the June 2023 Supreme Court ruling in *Allen v. Milligan*. For example:

---

[8] The hearings are publicly available at https://youtu.be/UsNRxddye4o (September 25, 2023, Elizabeth City), https://youtu.be/MyCnIQidVNs (September 26, 2023, Hickory), https://youtu.be/9Q4N4y9MsYo (September 27, 2023, Raleigh). Upon information and belief, the North Carolina General Assembly has created transcriptions of these hearings, as represented by Senator Newton in the September 25, 2023 hearing. *See* https://youtu.be/UsNRxddye4o at minute 6:15.

100.    In the September 25 hearing in Elizabeth City, Pasquotank County NAACP President Keith Rivers stated that redistricting "does not draw maps that dilute minority voters" but rather "is the process that ensures fair and equal representation."[9]

101.    In the September 26 hearing in Hickory, speaker Kyle Brazile conveyed that the legislature "must show that the Voting Rights Act is being complied with."[10]

102.    In the September 27 hearing in Raleigh, speaker Nakia Smith asked for a transparent redistricting process in which "race would be considered within the context of the Voting Rights Act."[11]

103.    In the same September 27 hearing, Plaintiff Syene Jasmin asked for a process that "is compliant with Section 2 of the Voting Rights Act" and "to honor our communities of interest and to protect Black voters right now."[12]

104.    Many public commenters in the Three September Hearings also expressed concern and frustration at the already-deficient process for redistricting. For example:

105.    In the September 25 meeting in Elizabeth City, League of Women Voters member Amber Turner stated the need for lawful and publicly adopted redistricting criteria, for the legislature to explain the basis for changes to district lines, and that there was "no reason that the General Assembly cannot immediately provide public notice of the full timeline for redrawing our voting maps."[13]

---

[9] *See* https://youtu.be/UsNRxddye4o at minute 11:30.
[10] *See* https://youtu.be/MyCnIQidVNs at minute 1:24:00.
[11] *See* https://youtu.be/9Q4N4y9MsYo at minute 37:20.
[12] *See* https://youtu.be/9Q4N4y9MsYo at minute 1:51:50.
[13] *See* https://youtu.be/UsNRxddye4o at minute 18:45.

106. In the same September 25 meeting, speaker John Houston stated that the small audience in Elizabeth City was "by design" and that the process for redistricting would give a "strong indication about whether you are intending to do your job fairly."[14]

107. In the September 26 hearing in Hickory, speakers noted the lack of language access, excessive drive time and difficulty in attending the hearing and mentioned members of the public that wanted to attend but could not.[15]

108. In the September 27 hearing in Raleigh, Plaintiff Syene Jasmin expressed frustration that the legislature was only holding "three hearings when the majority of North Carolinians have to work."[16]

109. In the same September 27 hearing, speaker Stacey Carless of the NC Counts Coalition stated that "with so little advance notice, no virtual participation option, and no information about the criteria that will be used to draw voting districts or what maps may or may not be in consideration, the process discourages [and] prevents meaningful participation."[17]

110. At the end of the last redistricting public hearing on September 27, Defendant Hise issued a reminder that the online comment portal was live and stated that comments received via such portal would be "emailed as copies to the members of the committees we

---

[14] *See* https://youtu.be/UsNRxddye4o at minute 44:15.
[15] *See* https://youtu.be/MyCnIQidVNs at minutes 35:00 (stating hearings had lack of language access for non-English native speakers and long drive time), 59:30 (stating awareness of a member of the public that could not attend), 1:05:00 (stating there was not enough time to prepare, the hearing required a long drive, there was difficulty getting child care in order to attend, and the hearing space was inaccessible to disabled members of the public), 1:16:30 (stating awareness of members of the public that could not make it to the hearing due to travel and childcare).
[16] *See* https://youtu.be/9Q4N4y9MsYo at minute 1:51:40.
[17] *See* https://youtu.be/9Q4N4y9MsYo at minute 1:54:00.

anticipate on a weekly basis." He then adjourned the meeting without providing any further information on what would occur in the process going forward.[18]

111. On October 18, redistricting leaders in the North Carolina House, including Defendant Hall as a co-sponsor, introduced House Bill 898, which proposed new state house districts. On the same day, colleagues in the state senate filed Senate Bill 756 and Senate Bill 757 as two new proposals to realign congressional districts, as well as Senate Bill 758 to realign state senate districts. Defendant Newton was the primary sponsor of the three senate bills, which were each also co-sponsored by Defendants Daniel and Hise.

112. Upon information and belief, the redistricting maps were drawn in private rooms without an opportunity for public viewing during the drawing process. This represented a shift from past years, where the map-drawing was performed on public terminals and live-streamed.

113. During the weekend between when new voting plans were filed (October 18) and ratified (October 25), the Southern Coalition for Social Justice sent a letter to lawmakers in response to public comments from Chairs Hise and Hall, who invited information concerning racially polarized voting in the state ("The October 22 Letter").[19]

114. The October 22 Letter informed lawmakers that it was "readily apparent that the State Senate plan contained in Senate Bill 758 would unlawfully dilute the voting strength of Black voters in northeast North Carolina in Senate Districts 1 & 2, in violation

---

[18] *See* https://youtu.be/9Q4N4y9MsYo at minute 2:55:50.
[19] Available at https://southerncoalition.org/wp-content/uploads/2023/10/NCGA-VRA-Senate-Ltr-10.22.23-FINAL.pdf.

of the VRA." In Appendix A to the letter, SCSJ provided an expert analysis by political scientist Professor Kassra Oskooii, which contained a racially polarized voting study that confirmed racially polarized voting would prevent Black voters from having any opportunity to elect their candidate of choice in Senate Districts 1 & 2, and noting that the alternative 2022 Senate configurations in this area would provide more opportunity for Black voters without the need to affect any other districts in the proposed maps. In Appendix B, SCSJ also provided preliminary racially polarized voting analysis for counties in North Carolina with high percentages of Black voting age population, showing "extreme racially polarized voting in North Carolina's Black Belt." October 22 Letter at 5.

115. The October 22 Letter also noted the "extraordinary posture in which this limited analysis is offered" given the "remarkably compressed timeline for evaluating" plans mandated by the General Assembly. October 22 Letter at 4. The October 22 Letter itself was produced and sent to the General Assembly merely four days after draft maps were first introduced, "in response to the invitation of Chairs Hise and Hall . . . to bring forward information concerning racially polarized voting[.]" October 22 Letter at 1.

116. The October 22 Letter contextualized the analysis provided for Senate Districts 1 and 2 accordingly, saying that the district-specific information "cannot and should not be read as an indication there are no VRA concerns elsewhere in the maps[.]" October 22 Letter at 4. "[I]nstead," the Letter cautioned, "the fact that a clear, impending violation could be identified even on this truncated timeline should be understood as a warning sign. Under the circumstances, these maps and the process by which they are being considered run an alarming, unjustifiable risk of violating the VRA." *Id.*

35

117.    The October 22 Letter concluded with "hope the General Assembly will utilize this information and perform additional analysis so that it follows well-established law and ensures that minority voters in North Carolina have an equal opportunity to elect candidates of their choice," and with hope that the General Assembly would not further misconstrue what the law requires. October 22 Letter at 5.

118.    Upon information and belief, the legislative leadership took no action after receipt of the October 22 Letter to ensure Voting Rights Act compliance in their proposed maps.

119.    Other legislators expressed concern, however, that the maps would violate the Voting Rights Act, and amendments were proposed in both the state House and state Senate with the objective of ensuring equal voting power for North Carolinians. But in every instance, the amendments failed.

120.    The North Carolina General Assembly hastily ratified the 2023 Plans on October 25, 2023, after merely one week of review and consideration of amendments and no opportunity for in-person public comment following the release of draft maps.

121.    In drafting the 2023 Congressional Plan, as proposed in Senate Bill 757, the General Assembly purportedly followed certain criteria outlined in a one-page document titled "2023 Congressional Plan Criteria."[20]

---

[20] Available at https://webservices.ncleg.gov/ViewDocSiteFile/81634.

36

122.    In drafting the 2023 Senate Plan, as proposed in Senate Bill 758, the General

Assembly purportedly followed criteria outlined in a one-page document titled "2023

Senate Plan Criteria."[21]

123.    The 2023 Senate Plan utilizes the *Stephenson* cluster configuration

"Duke_Senate_04," displayed below in **Figure 1**:[22]

**Figure 1: Duke Senate Clusters utilized in the 2023 Senate Plan.**



124.    For the 2023 House Plan, proposed as House Bill 898, the General Assembly

purportedly asked their map-drawer to follow certain criteria outlined in a document titled

"Guidance for Drawing State house and Congressional Districts," which was transmitted

---

[21] Available at https://webservices.ncleg.gov/ViewDocSiteFile/81635
[22] Available at https://webservices.ncleg.gov/ViewDocSiteFile/38491, p. 6.

to their hired map-drawer on August 23, 2023 along with the residences of Congressional and House Members.

125. The 2023 House Plan utilizes the *Stephenson* cluster option 'Duke_House_3," shown in **Figure 2** below:

**Figure 2: Duke House Clusters utilized in the 2023 House Plan.**



126. Notably, for all three maps, the General Assembly nominally self-imposed a prohibition on using racial data in drawing new maps. The criteria purportedly used to draft the state senate and congressional plans each state that "[d]ata identifying the race of individuals or voters shall *not* be used in the drafting of districts" of those plans. (emphasis in original). Likewise, the purported state house criteria provided that "[d]ata identifying

38

the race of individuals or voters shall not be used in the construction or consideration of districts" in the new house plan.

127.    Notwithstanding such prohibition, the General Assembly, including Defendants, admitted to using certain voter data and did not disclose any methods or processes for ensuring districts would not be redrawn with racial predominance.

128.    Moreover, upon information and belief, the map-drawers and those contributing to and directing the map-drawing process were aware of the racial composition of specific geographic areas and also were aware of, and intended, the disparate impact of new district lines on Black voters.

129.    Legislative leadership have repeatedly acknowledged having an understanding of where Black voters in North Carolina live. For example, Senator Hise testified at deposition that, as someone who has participated in every North Carolina redistricting effort since 2011, that he could not "un-know" that demographic information.

## V.    The Enactment of the 2023 Plans Was Intentionally Delayed to Frustrate Judicial Review.

130.    The General Assembly knew no later than April 28, 2023 that it would re-draw the state legislative and congressional redistricting plans for use in the 2024 election. *See* Press Release, SPEAKERMOORE.COM (Apr. 28, 2023).

131.    Despite this springtime clarity, the General Assembly did not begin the legislative process for redistricting until the end of September 2023—five months after leadership publicly stated their intent to redistrict.

39

132.    Upon information and belief, this delay was a significant, intentional procedural deviation, designed specifically to narrow the likelihood of any pre-enforcement judicial review or remediation of the 2023 Plans before the 2024 elections.

**VI.    The Discriminatory Harm to Black Voters in the 2023 Plans.**

133.    The 2023 Plans adopted by the General Assembly continue to impose barriers to Black voters in the electoral process and to their ability to elect their candidates of choice on an equal basis as other voters.

134.    The 2023 Congressional Plan, 2023 Senate Plan, and 2023 House Plan were adopted, at least in part, for the very purpose of diluting and diminishing the voting power of North Carolina's Black voters.

135.    These maps blatantly ignore the Fourteenth Amendment's prohibition on laws enacted with an invidious purpose and the Fifteenth Amendment's promise that the right to vote shall not be denied or abridged on the account of race.

136.    Upon information and belief, the map-drawers and individuals with input into the configuration of the 2023 Plans, including the placement of specific neighborhoods in particular districts, were aware of the racial composition of specific neighborhoods throughout the maps.  Upon information and belief, the map-drawers and individuals with input into the configuration of the 2023 Plans were similarly aware of and intended the disparate impact of new district lines on Black voters.

137.    Unless enjoined, the 2023 Plans are certain to produce discriminatory harm to Black voters, including the Individual Plaintiffs and members of the Organizational

Plaintiffs, because they will deny them an equal opportunity to participate in the political process, as set forth below.

A.  2023 Senate Plan

*North Carolina's Black Belt (Senate Districts 1 and 2)*

138.  The 2023 Senate Plan targets Black voters most obviously in *Stephenson* clusters "Z" and "Y," which form Senate Districts 1 and 2, respectively. Under the new districts set forth in the 2023 Senate Plan, Senate Districts 1 and 2 will both deny Black voters any opportunity to elect a candidate of their choice, in open defiance of the requirements of the Voting Rights Act.

139.  These districts sit in North Carolina's northeast, covering the heart of the state's Black Belt. The Black Belt is home to many significant and historic Black communities, including but not limited to Warren (49.3% BVAP), Halifax (51.7% BVAP), Nash (39.4% BVAP), Edgecombe (56.4% BVAP), Pitt (35.7% BVAP), Vance (50.0% BVAP), Northampton (55.2% BVAP), Martin (41.0% BVAP), Bertie (60.4% BVAP), Hertford (57.3% BVAP), Gates (31.4% BVAP), Chowan (32.1% BVAP), and Washington (47.9% BVAP) Counties.

140.  As shown below in **Figure 3,** the 2023 Senate Plan draws two of these counties, Pitt and Edgecombe, into Senate District 5, which provides Black voters with an opportunity to elect a candidate of their choice. The rest of the Black Belt, however, is splintered: instead of uniting counties along the North Carolina-Virginia border, the 2023 Senate Plan cracks them between Senate Districts 1 and 2. In both Senate Districts 1 and 2, Black Belt counties are paired with coastal communities hundreds of miles away,

resulting in extremely noncompact districts. In fact, the only way to navigate from one end of Senate District 2 to the other is by ferry travel, as the southern portion of the district is contiguous with the northern portion of the district only by water. These coastal communities have different needs and interests from the Black Belt, are much wealthier on average, and are overwhelmingly white.

**Figure 3: 2023 Senate Districts 1 & 2.**



141.    The 2023 Senate Plan's sprawling, disparate configuration of the Black Belt notwithstanding, and as set forth by the first prong of *Gingles,* it is possible to draw at least two reasonably configured majority-Black Senate districts in this area of the state.

142.    There is also legally significant racially polarized voting in this area of the state. North Carolina's extensive racially polarized voting has been recognized repeatedly by courts in recent years. *See, e.g.*, *McCrory*, 831 F.3d at 214; *N.C. State Conf. of the NAACP v. Cooper*, 430 F. Supp. 3d 15 (M.D.N.C. 2019), *rev'd on other grounds sub nom. N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295 (4th Cir. 2020). In recent years, racial polarization in voting has steadily *increased* in the Black Belt. Black voters in this area vote cohesively (preferring the same candidates at rates of 95% or more), and the Black voters and white voters in this area of North Carolina consistently prefer different candidates such that white voters vote sufficiently as a bloc (approximately 80% cohesion) to typically defeat Black voters in electing candidates in Senate Districts 1 and 2.[23]

143.    The presence of all three *Gingles* preconditions, taken together with North Carolina's history of discrimination in voting, establishes that the enactment of these districts violates the Voting Rights Act.

144.    This violation is extremely apparent and was widely noted as such from the moment the draft maps were released. *See, e.g.*, October 22 Letter ("[I]t is readily apparent that the State Senate plan contained in the 2023 Senate Plan would unlawfully dilute the voting strength of Black voters in northeast North Carolina in Senate Districts 1 & 2, in

---

[23] See Appendix A of NCGA VRA Senate Ltr.

violation of the VRA."). Even a cursory examination of the Voting Rights Act's requirements would have revealed this impending violation, as well as the obligation to remedy it. Nonetheless, the General Assembly plowed forward with the 2023 Senate Plan, with zero regard for the rights of Black North Carolinians.

145. Because the 2023 Senate Plan already contains one district in this area that allows Black voters to elect a candidate of their choice (Senate District 5), the Voting Rights Act only requires one additional opportunity district. If Senate District 5 were altered or re-drawn in the process of drawing such an additional Senate opportunity district, however, such a redraw could serve to dilute the votes of Black North Carolinians in this area, in violation of the Voting Rights Act.

*Wilmington area (Senate Districts 7 and 8)*

146. The 2023 Senate Plan also unlawfully undermines the political power of Black voters in southeastern North Carolina, and particularly in the Wilmington area.

147. Senate Districts 7 and 8 fall within *Stephenson* cluster "X" comprised of Columbus, Brunswick, and New Hanover Counties.

148. Senate District 8 includes all of Columbus and Brunswick Counties, and then dips into New Hanover County using a "notch" configuration that captures predominantly high BVAP precincts within the city of Wilmington. This can be seen in the **Figure 4** below, which shows shading according to percentage of Black voting age population in this area of the state:

44

**Figure 4: 2023 Senate Districts 7 and 8 with Shading by BVAP**



149.    There is no legitimate or compelling reason for configuring the districts in this manner. The population deviations within this configuration cause Senate Districts 7 and 8 to be significantly malapportioned, diluting the voting strength of voters in Senate District 8 (including Black voters captured within the Wilmington "notch") compared to Senate District 7. The 2023 Senate Plan's Wilmington high-BVAP "notch" thus produces a substantial population deviation between Senate Districts 7 and 8 that contravenes what would be expected if the district were drawn using traditional redistricting criteria. Overall, the *Stephenson* cluster in which Senate Districts 7 and 8 must be drawn includes a total of 413,018 people. Since the ideal population for a senate district in North Carolina is 208,788

people, and thus two "ideal districts" would have a total of 417,576, this cluster option is short 4,558 people required for districts with the most ideal populations. In other words, in aiming to equalize population between districts, a map-drawer applying race neutral and traditional redistricting criteria would tend to create two senate districts that are slightly underpopulated.

150. But that is not what the 2023 Senate Plan does. Senate District 7 has a deviation of -4.94% below ideal population size for a Senate district, while Senate District 8 has a deviation of 2.76% above ideal population size. This means the 2023 Senate Plan was drawn to *unnecessarily* shift predominantly high-BVAP areas of Wilmington into an unnecessarily over-populated Senate District 8. The 2023 Senate Plan shifts as many of these high-BVAP precincts as is possible to shift while retaining Senate District 7 as just over the minimum population threshold for superficial compliance with *Stephenson*. If any additional precinct had been shifted, Senate District 7 would facially violate *Stephenson* and the Whole County Provision by exceeding a population deviation of plus or minus 5%.

151. But superficial compliance with *Stephenson* does not automatically mean substantive compliance with one-person, one-vote. Rather than equalize population as nearly as practicable, the 2023 Senate Plan shifts far more (predominantly Black) voters to Senate District 8 than was necessary to equalize the population between the districts, and the deviation present is not necessary to serve any rational or legitimate state interest. This malapportionment was achieved by targeting Black voters in Wilmington, sorting them into Senate District 8 and thereby rendering their votes less powerful than those of voters in Senate District 7.

46

152.    None of this is explainable through compliance with any other traditional redistricting criteria. The high-BVAP "notch" makes both Senate Districts 7 and 8 less compact and unnecessarily splits more municipalities, including by separating downtown Wilmington from the rest of the city, than other configurations with lower population deviations would.

153.    In this way, the 2023 Senate Plan includes a textbook racial gerrymander that systematically overpopulates Senate District 8 and underpopulates Senate District 7. This racial gerrymander thus violates both the Fourteenth Amendment's one-person one-vote principle and its prohibition on racial gerrymandering.

*Mecklenburg/Iredell Cluster (Senate District 42)*

154.    The 2023 Senate Plan's districts in the Iredell-Mecklenburg "A" *Stephenson* cluster also unlawfully manipulate population deviations to afford Black voters less voting power within the area.

155.    This county cluster contains the whole counties of Iredell County and Mecklenburg County, and contains Senate Districts 37, 38, 39, 40, 41, and 42. Senate District 37 contains all of Iredell County and precincts in the northern part of Mecklenburg County; all the other Senate districts in this cluster are wholly contained within Mecklenburg County.

156.    The districts within the Iredell-Mecklenburg "A" cluster were drawn such that the predominantly white Senate District 42 at the southern-most part of Mecklenburg County is significantly less populated than all other districts contained in Mecklenburg County, thereby providing the predominantly white voters in this district with greater

47

voting power than the remaining districts (Senate District 38, 39, 40, and 41), which have larger Black populations.

157.   This can be seen below in **Figure 5**, which shows shading of high-BVAP precincts across districts in Mecklenburg, and **Table 1**, which shows the BVAP percentages and population deviations of each Mecklenburg senate district as compared to the ideal senate district population of 208,788 people overall.

**Figure 5: Mecklenburg Senate Districts with Shading by BVAP**



**Table 1: Population and Deviation of Senate Districts in Mecklenburg County**

| Senate District | % BVAP | Population | Deviation |
|---|---|---|---|
| SD 38 | 37.28% | 217,905 | 4.37% |
| SD 39 | 25.89% | 219,123 | 4.95% |
| SD 40 | 41.08% | 218,881 | 4.83% |
| SD 41 | 43.04% | 217,678 | 4.26% |
| *SD 42* | *9.86%* | *209,378* | *0.28%* |

158.    As **Table 1** makes clear, instead of equalizing the population amongst the districts in this cluster, the 2023 Senate Plan again arbitrarily manipulates the voting power of the residents of the county. Senate Districts 38, 39, 40, and 41 all have BVAP levels ranging from 25%-43% and corresponding deviations very close to 5% over the ideal number—the maximum allowed by the North Carolina Whole County Provision under *Stephenson*. Five of the six districts in the cluster range from 4.26% overpopulated (Senate District 41) to 4.99% overpopulated (Senate District 37). By contrast, Senate District 42 is only 0.28% overpopulated, a difference of nearly 4% from the next closest district in the county grouping. This means that fewer voters are required to win Senate District 42 than any other district in this grouping, which in turn gives residents of Senate District 42 more voting power than those in any other district in the cluster.

159.    Senate District 42 stretches traditional redistricting criteria to their breaking point to seek out the precincts with the highest percentages of white residents and confer disproportionately higher voting power on them, as compared to neighboring districts with significantly higher BVAP populations. As shown in **Figure 6,** after collecting the precincts in the southeast corner of Mecklenburg County, in the municipalities of Mathews and Mint Hill, Senate District 42 wraps around Senate Districts 40 and 41 to create a narrow, spindly

49

"arm" which shrinks at points to a width of less than 1000 feet and stretches from the county line nearly to downtown Charlotte.

**Figure 6: Senate District 42 with Shading by BVAP**



160.    The narrow "arm" in Senate District 42, squeezed between Districts 39, 40, and 41, picks up overwhelmingly white precincts: of the seven precincts contained in the arm, six are over 83% white, and all of them have higher proportions of white population than Senate District 42 as a whole. This arm also wreaks havoc with the compactness of the district.

161.    Senate District 42 was therefore drawn to systematically diminish the voting power of Black residents in Mecklenburg County. This malapportionment was achieved by surgically excluding Black voters from Senate District 42, exchanging them for

50

overwhelmingly white precincts whenever possible, and thereby elevating the power of those white voters at the expense of Black voters in Mecklenburg County.

162. The systematic underpopulation of Senate District 42 compared to the rest of the Iredell-Mecklenburg cluster is not at all justified by, let alone necessary for, compliance with any rational or legitimate state interest. Nor were any of these choices necessary to better comply with any traditional redistricting criteria. Instead, the 2023 Senate Plan makes Senate District 42 much less compact than necessary and does not do so in order to maintain any whole municipalities.

163. Senate District 42's systematic and unjustifiable underpopulation compared to the rest of the Iredell-Mecklenburg grouping thus violates the Fourteenth Amendment's one-person one-vote principle.

B. 2023 House Plan

*North Carolina's Black Belt (House Districts 4, 5, 7, 10, 12, 24, 25, 32)*

164. The 2023 House Plan dilutes the electoral power of Black voters in northeastern North Carolina, submerging cohesive Black populations in larger white populations throughout the region. The 2023 House Plan achieves this through the rigid, erroneous application of the default *Stephenson* clusters. The 2023 House Plan's perfunctory adherence to those default county groupings plainly fails to account for the requirements of the Voting Rights Act, including the racial demographic data in eastern North Carolina and the increasingly stark racially polarized voting in this area, thereby contradicting the guidance of *Stephenson* that "legislative districts required by the VRA shall be formed prior to creation of non-VRA districts." *Stephenson I*, 355 N.C. at 383. The

Case 1:23-cv-01104   Document 1   Filed 12/19/23   Page 51 of 87

General Assembly's failure to even consider what the Voting Rights Act would require in light of these facts, let alone take those required steps, results in the predictable, unlawful vote dilution present in the 2023 House Plan configuration of northeastern North Carolina.

165. Most of the county groupings the 2023 House Plan uses in eastern North Carolina are fixed by *Stephenson*. The 2023 House Plan reflects those default, VRA-blind groupings: cluster "S" (Vance/Granville/Franklin Counties), cluster "DD" (Warren/Northampton/ Halifax Counties), cluster "X" (Edgecombe/Bertie/Martin Counties), cluster "P" (Nash/Wilson Counties), cluster "BB" (Greene/Lenoir/Jones Counties) and cluster "T" (Pitt County), each of which is used in the 2023 House Plan, are all (absent the construction of any VRA district or districts) fixed county clusters under *Stephenson*. These groupings cover almost the entire Black Belt. There are only a handful of clusters used in the 2023 House Plan's configuration of northeastern North Carolina where there is any discretion under *Stephenson*: cluster "NN" (Hertford/Gates/Pasquotank/Camden Counties), cluster "KK" (Wayne/Duplin Counties), and cluster "MM" (Currituck/Dare/Perquimans/Chowan/Washington/Tyrell/Beaufort/ Hyde/Pamlico Counties).

166. These clusters contain the whole of North Carolina's Black Belt. These counties are home to significant and historical Black communities, including, in addition to the counties contained in Senate Districts 1 & 2, Pasquotank County (36.7% BVAP), Wilson County (39.1% BVAP), Greene County (37.3% BVAP), Lenoir County (40.5% BVAP), and Wayne County (31.8% BVAP).

52

167.     Through its unyielding adherence to these clusters, without further study of what the Voting Rights Act requires and adjustments accordingly, the 2023 House Plan unlawfully dilutes the voting strength of Black voters in northeastern North Carolina.

168.     The 2023 House Plan has only three districts in northeastern North Carolina where Black voters have an equal opportunity to elect a candidate of their choice. Two are majority-Black districts, in House District 23 (composed of the counties of Edgecombe, Martin, and Bertie) and House District 27 (composed of the counties of Warren, Halifax, and Northampton). The 2023 House Plan also contains a third district, House District 8 in Pitt County, in which Black voters make up a plurality of the district's population and have an opportunity to elect a candidate of their choice.

169.     But outside of these districts, Black voters in northeastern North Carolina are consistently submerged in white majorities, in districts where they will be defeated at the ballot box by larger white populations. House Districts 4 and 10, for example, crack the city of Goldsboro across both districts. House District 12 pairs large, compact Black populations in Kinston with still-larger white majorities. House District 5 joins historic Black populations in Hertford County and Elizabeth City with a white majority, including the predominantly white Camden County. House Districts 24 and 25, in Nash and Wilson Counties, combine the city of Wilson and parts of the city of Rocky Mount with white majorities in western parts of both counties. House District 7 groups Black voters in southern Vance County with a white majority anchored in Franklin County. The 2023 House Plan ensures that, despite the large number of Black voters in each of these districts, none of them will give Black voters an equal opportunity to elect a candidate of choice.

53

170. It is possible to draw six reasonably configured majority-Black house districts in northeastern North Carolina as set forth by the first prong of *Gingles*. Yet the 2023 House Plan only creates three Black opportunity districts in this area.

171. There is also legally significant racially polarized voting in this northeastern area of the state. North Carolina's extensive racially polarized voting has been recognized repeatedly by courts. *See, e.g.*, *McCrory*, 831 F.3d at 214; *N.C. State Conf. of the NAACP v. Cooper*, 430 F. Supp. 3d 15 (M.D.N.C. 2019), *rev'd on other grounds sub nom. N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295 (4th Cir. 2020). In recent years, racial polarization in voting has steadily *increased* in the Black Belt. Black voters in northeastern North Carolina vote cohesively (preferring the same candidates at rates of 95% or more), and the Black voters and white voters in this area of North Carolina consistently prefer different candidates such that white voters vote sufficiently as a bloc (approximately 80% cohesion) to typically defeat Black voters in electing candidates in these house districts.

172. The presence of all three *Gingles* preconditions, taken together with North Carolina's history of discrimination in voting, establishes that the enactment of these districts violates the Voting Rights Act.

173. Because the 2023 House Plan already contains three districts in this area that allow Black voters to elect a candidate of their choice (House Districts 8, 23, and 27), the Voting Rights Act requires only three additional opportunity districts. Many of the possible reconfigurations of this area of the 2023 House Plan to provide these additional opportunity districts, however, may result in changes to House Districts 8, 23, and/or 27. If such changes are made in attempting to remedy the Voting Rights Act violation present in the

54

2023 House Plan, those changes could violate the Voting Rights Act anew if they operated to deny Black voters in Districts 8, 23, and/or 27 the opportunity to elect candidates of their choice, or to reduce the number of opportunity districts overall.

*Wake County*

174.    The 2023 House Plan's districts in the *Stephenson* cluster "B" contained entirely within Wake County also systematically diminish the political power of Black voters in the Raleigh area by manipulating population deviations within the cluster.

175.    This county cluster consists of the entirety of Wake County, and contains House Districts 11, 21, 33, 34, 35, 36, 37, 38, 39, 40, 41, 49, and 66. As the largest county in North Carolina, it contains thirteen house districts. No cluster in the 2023 House Plan contains more.

176.    The districts within the Wake "B" cluster were drawn such that the predominantly white House District 35 at the northern-most part of Wake County is significantly less populated than all other districts in Wake County, thereby providing the predominantly white voters in this district with greater voting power than voters in the remaining districts in the cluster, many of which have large Black populations.

177.    This can be seen below in **Figure 7**, which shows shading of high-BVAP precincts across districts in Wake, and **Table 2**, which shows the BVAP percentages and population deviations of each Wake house district compared to the ideal house district of 86,995 overall.

55

**Figure 7: Wake House Districts with Shading by BVAP**



Case 1:23-cv-01104   Document 1   Filed 12/19/23   Page 56 of 87

**Table 2: Population and Deviation by House Districts in Wake County**

| Senate District | % BVAP | Population | Deviation |
|---|---|---|---|
| HD 11 | 11.36% | 86,381 | -0.71% |
| HD 21 | 9% | 87,764 | 0.88% |
| HD 33 | 41.21% | 85,001 | -2.29% |
| HD 34 | 16.87% | 89,807 | 3.23% |
| HD 35 | 12.7% | 83,094 | -4.48% |
| HD 36 | 9.37% | 86,038 | -1.1% |
| HD 37 | 13.38% | 90,307 | 3.81% |
| HD 38 | 40.89% | 86,444 | -0.63% |
| HD 39 | 34.22% | 85,371 | -1.87% |
| HD 40 | 13.88% | 86,359 | -0.73% |
| HD 41 | 11.55% | 89,876 | 3.31% |
| HD 49 | 13.34% | 84,251 | -3.15% |
| HD 66 | 28.71% | 88,717 | 1.98% |

178.    As **Table 2** makes clear, instead of equalizing the population amongst the districts in this cluster, the 2023 House Plan arbitrarily manipulates the electoral power of the voters of the county. Most of the house districts in this cluster are slightly below the ideal population size of 86,995 people. But House District 35, which has an extremely low BVAP and possesses the highest proportion of white voters in the cluster, has a significantly lower population than every other house district in Wake County. This means that fewer voters are required to win House District 35 than any other district in this grouping, which in turn gives voters of House District 35 more electoral power than those in any other district in the cluster.

179.    House District 35 achieves this artificially low population by scorning traditional redistricting criteria. The district spans the length of the northern border of Wake County, bobbing and weaving with seemingly no rhyme or reason. The district unnecessarily splits the city of Wake Forest, wrapping around it to both the east and the

Case 1:23-cv-01104   Document 1   Filed 12/19/23   Page 57 of 87

west instead of taking in the entire municipality. It also forsakes any attempt at compactness, instead making abrupt protrusions southward at both the eastern and western ends of the district.

180.    The systematic underpopulation of House District 35 compared to the rest of the Wake County cluster is not at all justified by, let alone necessary for, compliance with any rational or legitimate state interest. Nor were any of these choices necessary to better comply with any traditional redistricting criteria. Instead, the 2023 House Plan makes House District 35 much less compact than necessary and does so by unnecessarily splitting the city of Wake Forest.

181.    House District 35's systematic and unjustifiable underpopulation compared to the rest of the Wake grouping thus violates the Fourteenth Amendment's one-person one-vote principle.

*Forsyth-Stokes County*

182.    The 2023 House Plan's districts in the *Stephenson* cluster "E" within Forsyth and Stokes Counties also systematically diminishes the political power of Black voters in Winston-Salem, overpopulating two high-BVAP districts within Winston-Salem overall as compared to the lower-BVAP districts in the surrounding areas.

183.    Within Forsyth County and Stokes County are House Districts 71, 72, 74, 75, and 91. House District 91 contains all of Stokes County and precincts in the northern half of Forsyth County; all the other house districts in this cluster are wholly contained within Forsyth County.

184.    As shown below in **Figure 8,** House Districts 71 and 72 comprise most (but not all) of Winston-Salem and almost all of the high-BVAP precincts within the two counties, while House Districts 74, 75, and 91 each contain predominantly white precincts.

**Figure 8: Forsyth and Stokes House Districts with BVAP Shading**



185.    As shown in **Table 3**, the house districts in the "E" *Stephenson* cluster of Forsyth and Stokes Counties were drawn so that the high-BVAP House Districts 71 and 72 have an overall population deviation that is significantly higher than that of the low-BVAP House Districts 74, 75, and 91. This overall deviation is calculated by taking the ideal population for a house district of 86,995 people, and calculating the percentage difference

Case 1:23-cv-01104   Document 1   Filed 12/19/23   Page 59 of 87

between the actual deviation within districts and what the ideal districts would have. For example, high-BVAP House Districts 71 and 72 together would have an ideal population of 173,990 (i.e., 86,995 x 2), and as drawn in the 2023 House Plan nearly meet this with just -0.42% deviation with a combined population of 173,267. By contrast, low-BVAP House Districts 74, 75, and 91 together have a significantly lower overall deviation of -2.74% (comparing the ideal 3-district population of 260,985 to the actual population across these districts of 253,843). This lower population average in low-BVAP districts provides, overall, more voting power to low-BVAP districts than to high-BVAP districts.

**Table 3: Demographic and population deviation in Forsyth/Stokes House Districts**

| House District | BVAP % | Population | Deviation |
|---|---|---|---|
| HD 71 | 32.41% | 88,823 | 2.1% |
| HD 72 | 40.12% | 84,444 | -2.93% |
| *Average deviation for High BVAP districts* | | | *-0.42%* |
| HD 74 | 10.18% | 83,545 | -3.97% |
| HD 75 | 18.89% | 87,378 | 0.44% |
| HD 91 | 16.07% | 82,920 | -4.68% |
| *Average deviation for Low BVAP districts* | | | *-2.74%* |

186.    The 2023 House Plan thus manipulates population deviations within the Forsyth-Stokes grouping to create an overall population deviation across districts of 6.78% within the cluster itself. This over and underpopulation between high and low BVAP districts reflects the packing of Black residents in Winston-Salem into just two districts, House Districts 71 and 72, and the creation of three districts wherein Black voters have no opportunity to elect a candidate of their choice.

187.    The systematic overpopulation of House District 71 compared to the rest of the Forsyth-Stokes County cluster is not at all justified by, let alone necessary for,

compliance with any rational or legitimate state interest. Nor were any of these choices necessary to better comply with any traditional redistricting criteria. Instead, the 2023 House Plan makes the cluster less compact than necessary and creates more municipal splits than necessary to do so, causing every district in the cluster to dip into Winston-Salem. It also changes the mostly rural House District 91, which in 2022 included the northern and more-rural areas of Forsyth County, to instead dip even further into Winston-Salem's urban center.

188. House District 71's systematic overpopulation is unjustifiable and thus violates the Fourteenth Amendment's one-person one-vote principle.

C.  2023 Congressional Plan

*North Carolina's Black Belt (Congressional District 1)*

189. The General Assembly intentionally diluted the voting power of North Carolina's Black voters in the Black Belt by redrawing Congressional District 1 to reduce the opportunity there for Black voters to elect a candidate of their choice in the 2023 Congressional Plan. In doing so, the General Assembly enacted a plan that deviates from historic congressional district boundaries and disregards traditional redistricting criteria by splitting historic and longstanding communities of interest.

190. Congressional District 1 has historically been anchored in Pitt County. Both the 2022 Interim Congressional Plan used in the 2022 election and the General Assembly's (rejected) 2022 Remedial Congressional Plan included the northern parts of Pitt County in

61

Congressional District 1.[24] Before that, every single congressional plan used for the past *three decades*, in any election since at least 1992, has included at least part of Pitt County in Congressional District 1.[25]

191.    But in 2023, Congressional District 1 was drawn to exclude all of Pitt County, carving Greenville (the anchor of the Black Belt) out of the Black Belt-based district, and replacing it with overwhelmingly white Camden and Currituck Counties. This move itself also created unprecedented consequences, breaking up the coastal congressional district that, also for the past three decades, had united Camden and Currituck with other coastal counties to elect a candidate to Congress.[26] The change in Congressional District 1, and its cracking of the Black Belt into a less compact district, is visible below in **Figure 9.**

---

[24] *See* 2022 Interim Congressional, available at
https://www.ncleg.gov/Files/GIS/Plans_Main/Congress_2022_Court/2022%20Interim%20Congressional%20-%2011%20x%2017%20Map.pdf; S.L. 2022-3 Congressional Plan, available at
https://www.ncleg.gov/Files/GIS/Plans_Main/Congress_2022/SL%202022-3%20Congress%20-%2011%20x%2017%20Map.pdf.

[25] *See, e.g.,*
- https://www.ncleg.gov/Files/GIS/Plans_Main/Congress_1992/mapSimple.pdf ("1992 Congressional Base Plan #10" used in 1992-1996 elections);
- https://www.ncleg.gov/Files/GIS/Plans_Main/Congress_1998/mapSimple.pdf ("98 Congressional Plan A" used in 1998 election);
https://www.ncleg.gov/Files/GIS/Plans_Main/Congress_1997/mapSimple.pdf ("97 House/Senate Plan A" used in 2000 election);
- https://www.ncleg.gov/Files/GIS/Plans_Main/Congress_2001/mapSimple.pdf ("Congress Zero Deviation" used in 2002-2010 elections);
- https://www.ncleg.gov/Files/GIS/Plans_Main/Congress_2011/mapSimple.pdf ("Rucho-Lewis Congress 3" used in 2012-2014 elections);
- https://www.ncleg.gov/Files/GIS/Plans_Main/Congress_2016/mapSimple.pdf ("2016 Contingent Congressional Plan – Corrected" used in 2016-2018 elections);
- https://www.ncleg.gov/Files/GIS/Plans_Main/Congress_2019/HB1029%203rd%20Edition%20-%2011x17_Map.pdf ("HB1029 4rd Edition" used in 2020 election).

[26] *See supra* n. 24.

**Figure 9: Congressional District 1 in 2022 (left) and 2023 (right) with BVAP shading.**



192.     With this reconfiguration, the 2023 Congressional Plan dilutes Black voting power overall, reducing the BVAP of Congressional District 1 from 41.23% in 2022 to 40.42% in 2023. This reduction in Black voting power was achieved by, among other changes, removing high-BVAP areas of Pitt County (including Greenville), which were 37.5% BVAP, from Congressional District 1 and replacing them with predominantly white Currituck and Camden Counties, with just 5.8% and 11.9% BVAP respectively. These changes are occurring in an area of the state with extreme, increasing racially polarized voting. As a result, Black voters will have less opportunity to elect a candidate of their choice under the 2023 Congressional Plan.

193.     These changes cannot be justified by adherence to traditional redistricting criteria. Congressional District 1 under the 2023 Congressional Plan is significantly less compact than its 2022 configuration or what is otherwise possible, and, as noted above, it now breaks apart two longstanding communities of interest: the Black Belt and the coastal counties.

194.     The 2023 Congressional Plan thus unlawfully dilutes the voting power of Black voters in Congressional District 1 in violation of Section 2 of the Voting Rights Act.

*The Triad (Congressional Districts 5, 6, 9, and 10)*

195.    The 2023 Congressional Plan also dilutes the voting power of Black voters in the Triad area in and around the cities of Greensboro, High Point, and Winston-Salem within Guilford, Forsyth, Davidson, and Randolph Counties.

196.    Despite having one of the most concentrated, longstanding, and historically significant Black populations in the state, the Triad is cracked between four new Congressional Districts (5, 6, 9, 10) under the 2023 Congressional Plan, as shown in **Figure 10** below:

**Figure 10: Triad 2023 Congressional Districts 5, 6, 9, and 10 with BVAP Shading**



197.    The Triad Congressional Districts 5, 6, 9, and 10 were redrawn in a manner that will deprive Black voters in this area any opportunity to elect a candidate of choice and will completely shut them out of any representation before Congress.

198.    The 2023 Congressional Plan thus unlawfully dilutes the voting power of Black Voters in the Triad Districts 5, 6, 9, and 10 in violation of the Voting Rights Act.

64

**VII.   Defendants Cannot Claim Immunity from the Protections Afforded Black Voters Under the Voting Rights Act and the U.S. Constitution by Merely Claiming a Partisan Intent.**

199.    The Voting Rights Act and the U.S. Constitution protect all voters from the intentional discrimination and diminishment of voting power on account of race even if they have been targeted for partisan ends.

200.    State actors may not "intentionally target[] a particular race's access to the franchise because its members vote for a particular party, in a predictable manner," because such conduct "constitutes discriminatory purpose . . . even absent any evidence of race-based hatred and despite the obvious political dynamics." *McCrory*, 831 F.3d at 222–23 (4th Cir. 2016). "A state legislature acting on such a motivation engages in intentional racial discrimination in violation of the Fourteenth Amendment and the Voting Rights Act." *Id.*

**VIII.  The Totality of the Circumstances Shows that the 2023 Plans Will Deny Black Voters Equal Opportunity to Participate in the Political Process on Account of Race, Not Politics.**

201.    Federal courts have repeatedly and recently determined that voting in North Carolina, including northeastern North Carolina, has been racially polarized.

202.    The racial polarization of voting in North Carolina is rooted in the state's founding and history as a slave society, in which the state's social, economic, political, and cultural institutions were each heavily intertwined with and influenced by chattel, race-based slavery.

203.    Racial discrimination in North Carolina not only endured after slavery was abolished but was codified in 1866 in the North Carolina Black Codes ("Black Codes").

The Black Codes severely restricted the rights of Black citizens and sought to recreate conditions of slavery.

204. The legal invalidation of the Black Codes, rather than empowering Black people in the state, gave rise to a pattern of Black disenfranchisement that endures today.

205. The Black Belt, home to many majority-Black counties and large Black populations in others, has been particularly affected by this disenfranchisement. In 1870, white Democrats gave the legislature control over county governments, redrew city ward lines, implemented new voter registration schemes, and gave wide latitude to local registrars, all in an effort to dilute Black voting power.

206. At the same time, the Ku Klux Klan, the Red Shirts, and other white supremacist "clubs" functioned as the paramilitary wing of the party and used violence and intimidation against Black citizens and their allies to quash Black voting power. This violence has been well documented in the Black Belt and culminated in numerous historic tragedies, including the Wilmington race massacre of 1898.

207. Following the 1900 elections, state legislators continued to enact measures designed to disenfranchise and dilute the voting power of Black North Carolinians. These measures included a poll tax, a literacy test to be administered at the discretion of local white registrars, and a grandfather clause designed to protect illiterate and poor whites. These measures were largely successful in suppressing Black voting power until after World War II.

208. Thereafter, wherever Black voters began accumulating power in North Carolina, the state has acted swiftly to quell it by redrawing voting districts, implementing

66

at-large electoral schemes, and enacting anti-single-shot laws designed to protect white candidates and invalidate Black votes.

209.    For example, after the implementation of the federal Voting Rights Act in 1965, nearly half of North Carolina's counties, and most in the Black Belt, were "covered jurisdictions" for which electoral changes were required to be submitted to the Department of Justice for preclearance. Nevertheless, the state legislature repeatedly adopted at-large voting systems for various political subdivisions without submitting those changes to the Department of Justice.

210.    When at-large voting was adopted for the General Assembly, it was quickly followed with an increase in multi-member districts and adding a numbered post requirement to the districts in the Black Belt, all of which were designed to ensure that Black candidates could not be elected to the General Assembly.

211.    From 1970 to 2013, the Department of Justice entered 60 objections to proposed electoral changes in North Carolina, including the use of at-large schemes, majority requirements for primary elections, staggered terms, racially selective annexations, and polling place changes. At least 26 of these objections related specifically to districts in the eastern Black Belt. During this same time period, dozens of private plaintiffs successfully sued to overturn these electoral changes as courts found them to be racially discriminatory.

212.    The end of preclearance in 2013 gave way to additional vote suppression and dilution tactics that persist today. For example, in 2013, the General Assembly passed legislation to require photo identification and eliminated the first week of early voting,

67

same-day registration, and straight-ticket voting. In 2016, the Fourth Circuit noted that Republicans had sought racial data while drafting the law, which represented "one of the largest restrictions of the franchise" and was enacted "because of race." *McCrory*, 831 F.3d at 242.

213. The General Assembly has also sought on numerous occasions since 2016 to suppress the Black vote under the guise of suppressing voter fraud. While there has been scant evidence of voter fraud, the General Assembly is well aware that the electoral changes have had the effect of suppressing the Black vote.

214. In recent years, there have similarly been instances of racialized voter intimidation in the purported name of combatting voter fraud. For example, in 2022 in Brunswick County, white North Carolinians canvassed Black neighborhoods and questioned residents about the status of voters registered to those addresses.

215. In sum, North Carolina's history of racially discriminatory voter suppression and dilution is pervasive and persistent, especially in regions with large Black populations, such as the Black Belt and Triad regions. The codification of that discrimination is well-documented, with dozens of state and local electoral laws implementing vote-suppressing mechanisms such as at-large voting systems, and dozens of courts finding these laws racially discriminatory. Although the General Assembly offers voter fraud as an ostensible non-discriminatory reason for imposing additional voting restrictions today, there is extraordinarily little evidence of voter fraud in North Carolina. The absence of such evidence instead supports an inference that these laws are once again racially motivated.

216.    Further, the discriminatory election laws in North Carolina have largely been and continue to be successful in suppressing Black votes. Statewide, the candidates of choice of Black voters have had less electoral success, especially in the last decade.

217.    Between the adoption of the Disenfranchisement Act, drafted by the General Assembly and approved in the North Carolina general election of 1900, to World War II, no Black candidate was elected to office in North Carolina.

218.    Although the *Gingles* litigation in the 1980s, and similar subsequent litigation, increased Black representation in North Carolina's political institutions, Black representation has remained disproportionately low. In 2022, the state achieved a record number of Black representatives elected to the U.S. House of Representatives: three.

219.    In the Black Belt counties, where white officials historically have used at-large schemes and enhancing devices to dilute the Black vote, Black representation on local bodies often falls considerably short of equitable levels. For example, Black residents constitute 53.1% of the population of Halifax County but hold just 32 of the county's 93 local elected positions. Edgecombe County has a population that is 57.7% Black. Edgecombe has 95 local offices, and only 28 of them are held by Black officials. Hyde County has a population that is 30% Black but has only 1 Black local elected official. Tyrrell County is 36.6% Black and has 3 Black local elected officials.

220.    In the Triad, Guilford County is 33.8% Black and has 35 Black elected officials out 119 positions. Forsyth County is 27.1% Black and has 14 Black elected officials out of 118 positions.

Case 1:23-cv-01104   Document 1   Filed 12/19/23   Page 69 of 87

221. In tandem with North Carolina's history of racially discriminatory election laws, campaigns have and continue to rely on race as a means of appealing to voters.

222. For example, in 2008, the North Carolina Republican Party targeted candidates in the Democratic primary that had endorsed then-presidential candidate Barack Obama with inherently racial appeals referencing African garb and using coded language to paint the candidates as "extreme."

223. Similar racially-motivated attacks on candidates have sought to exploit white insecurity; for example, ads have insinuated that a Black man and purported criminal could move into white neighborhoods and that immigrants are stealing white voters' jobs.

224. In 2018, a white state supreme court candidate repeatedly tweeted attacks on his opponent with photos of Black defendants and references to race. Although his opponent had no involvement in defending or adjudicating the cases of the defendants in question, the tweets implied that his opponent played a role in their commutations by claiming that jurors had been racist or that executing those defendants would be racist.

225. The same year, one white General Assembly candidate published a website with remarks including "What is wrong with being a white supremacist? God is a racist and a white supremacist."

226. In the run-up to the 2020 gubernatorial campaign, a white candidate remarked that "no other nation" had survived the "diversity and multiculturalism that America faces today, because of a lack of assimilation, because of this division, and because of this identity politics." In the same gubernatorial cycle, advertisements attacking

Black candidate Stacey Abrams—herself not even a candidate in North Carolina—artificially darkened her skin.

227. In 2022, political advertisements targeting a Black U.S. Senate candidate highlighted white crime victims while claiming the candidate was "soft on crime." The same year, political advertisements accused Democratic candidates of "want[ing] to decide who gets hired – and who gets fired according to their skin color."

228. As a result of the above-described history of discrimination, Black residents of North Carolina are disproportionately likely to move, be poor, less educated, have less access to transportation, and experience poor health.

229. The 2020 Census determined that Black North Carolinians are more than twice as likely as white residents to be living below the federal poverty level.

230. 2023 data from the U.S. Bureau of Labor Statistics indicates that Black North Carolinians are twice as likely as white residents to be unemployed.

231. Black North Carolinians are three times as likely as white residents to lack access to a vehicle.

232. North Carolina schools and quality of education in the state continue to suffer the effects of segregation. Thirteen school districts in North Carolina are still under court-ordered desegregation mandates because those schools never legally desegregated, and more than half of those are in the Black Belt. Other school districts desegregated in name only; integration was quickly followed with the attempted implementation of new school districts and private schools intended to preserve segregation.

233. Today, charter schools and private schools are used as a means of continuing school segregation, particularly in the eastern Black Belt and Triad areas. At the same time, public schools in these areas are drastically underfunded, the effects of which are overwhelmingly born by Black people.

234. Black North Carolinians are also disproportionately affected by environmental pollution, which causes an array of health problems.

235. All of these factors cause Black residents of North Carolina to be less likely to be able to take time off to vote, to get to the polls, to contribute to a political campaign, or to run for office.

236. The General Assembly has largely been unresponsive to the needs and concerns of the Black community. For example, lawmakers have ignored the Black community's opposition to bans on teaching "critical race theory" due to concerns that such bans effectively prevent teaching about the history of racism and anti-racism.

237. Lawmakers have similarly ignored the Black community's concerns about voting restrictions purportedly enacted to address voter fraud despite the significant impact such measures have on minority voters and the lack of evidence suggesting that voter fraud is occurring in the state.

238. Finally, although the Black community disproportionately experiences healthcare problems and has less access to quality healthcare, the General Assembly has resisted efforts to expand Medicaid and did so only on the condition that certain elements which were unfavorable to Black voters would be paired with the expansion.

239.    In short, socioeconomic disparities and the effects of discrimination are directly related to a lack of responsiveness by government actors to Black voters in addressing these issues. These disparities and experiences of discrimination also directly and negatively impact the level of political participation among Black voters. Not only has North Carolina's history of discriminatory electoral laws limited Black voters' access to the franchise—it has had devastating effects on all aspects of life in North Carolina for Black people and ensured that concerns about those effects go unheard and unresolved.

## CLAIMS

### Count 1
*Discriminatory results in violation of § 2 of the Voting Rights Act:*
*2023 Senate Districts 1 & 2*

240.    Plaintiffs reallege and reincorporate by reference the allegations set forth above.

241.    Section 2 of the Voting Rights Act establishes that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

242.    A violation of Section 2 "is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by [Section 2] in that its members have less opportunity than

73

other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

243. The 2023 Senate Plan violates Section 2 of the Voting Rights Act because under the totality of the circumstances it has the effect of denying Black voters in North Carolina's Black Belt an equal opportunity to participate in the political process and elect representatives of their choice by diluting their voting strength.

244. Black voters in the Black Belt of North Carolina are sufficiently numerous to form a majority of the Black voting age population in at least two reasonably configured senate districts that adhere to traditional redistricting criteria.

245. Black voters in North Carolina's Black Belt and in these two potential districts vote cohesively yet will be consistently blocked from electing candidates of their choice by white voters, who will vote sufficiently as a bloc to usually defeat the candidate of choice of Black voters in both Senate Districts 1 and 2.

246. Individual Plaintiffs Dawn Daly-Mack and Calvin Jones, as well as members of Organizational Plaintiffs, are among the Black voters who will be denied an equal opportunity to participate in the political process leading to the election of state senators as a result of the unlawful effect of the 2023 Senate Plan.

247. The General Assembly failed to assess, prior to using the county clusters in "Duke_Senate_04", whether any senate districts were required by the Voting Rights Act. They did this despite receiving information that formed a strong basis in evidence that there is racially polarized voting in North Carolina, and specifically in North Carolina's Black Belt and in Senate Districts 1 and 2, such that Black voters would be denied an opportunity

74

to elect a candidate of choice or participate equally on account of race. The General Assembly therefore violated the mandate set forth in *Stephenson I*, to draw VRA-required districts "prior to" complying with the North Carolina Constitution's Whole County Provision, as required under both federal and state law, 355 N.C. at 384, and where compliance with all legal requirements was otherwise possible. This failure to draw VRA districts first under *Stephenson* is inextricable from the Section 2 violation.

248.    Plaintiffs have a right of action under Section 2 of the Voting Rights Act, 52 U.S.C. 101301 *et seq.*, as well as under 42 U.S.C. § 1983. *See Maine v. Thiboutot*, 448 U.S. 1 (1980).

## <u>Count 2</u>
### *Racial gerrymandering in violation of the Fourteenth Amendment:*
### *2023 Senate Districts 7 & 8*

249.    Plaintiffs reallege and reincorporate by reference the allegations set forth above.

250.    Race was the predominant factor in the drawing of the 2023 Senate Plan, and specifically in the configuration of Senate Districts 7 and 8, subordinating other redistricting criteria to race, without a compelling justification, in violating of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

251.    Individual Plaintiff Hollis Briggs and members of the Organizational Plaintiffs are among the Black voters impacted by the racial gerrymandering in Senate Districts 7 and 8.

## Count 3
### Malapportionment in Violation of the Fourteenth Amendment:
### 2023 Senate Plan

252.    Plaintiffs reallege and reincorporate by reference the allegations set forth above.

253.    "[A]n individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State." *Reynolds v. Sims*, 377 U.S. 533, 568 (1964).

254.    While population deviations of plus or minus 5% and a total deviation of 10% between districts within state legislative plans are *prima facie* constitutional, *Brown v. Thomson*, 462 U.S. 835, 842–43 (1983); *accord Stephenson I*, 355 N.C. at 383–84, states must make "an honest and good faith effort to construct districts . . . as *nearly of equal population as is practicable*[.]'" *Thomson*, 462 U.S. at 842 (quoting *Reynolds*, 377 U.S. at 577, emphasis added). This is because "the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis." *Reynolds*, 377 U.S. at 568.

255.    Thus, state legislative plans are provided a *prima facia* presumption of constitutionality within the plus or minus 5% deviation to allow them the leeway needed to achieve only *legitimate* state interests, such as maintaining political subdivisions and drawing compact districts. *Id.* at 578–79. But this 10% range is not a safe harbor, and states are not free to manipulate deviations within this range without adequate justification. *Larios v. Cox*, 300 F. Supp. 2d 1320, 1341 (N.D. Ga. 2004), *aff'd sub nom Cox v. Larios*, 542 U.S. 947 (2004).

76

256.   Merely constructing a plan that is within 10% total deviation "does not completely insulate a state's districting plan from attack of any type. Instead, that level serves as the determining point for allocating the burden of proof in a one person, one vote case." *Daly v. Hunt*, 93 F.3d 1212, 1220 (4th Cir. 1996). If the plan's maximum deviation is less than 10%, a plaintiff may still show a one person, one vote violation by producing "further evidence to show that the apportionment process had a 'taint of arbitrariness or discrimination.'" *Id.* (quoting *Roman v. Sincock*, 377 U.S. 695, 710 (1964)). "[T]he showing required to justify population deviations is flexible, depending on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely." *Karcher v. Daggett*, 462 U.S. 725, 741 (1983).

257.   While the county clusters required under *Stephenson I* to meet the North Carolina Constitution's Whole County Provision may justify some population deviation *between* county groupings, the Whole County Provision cannot justify unnecessarily large deviations between districts *within* the same *Stephenson*-defined cluster. Such districts must still result from "an honest and good faith effort to construct districts . . . as nearly of equal population as is practicable." *Reynolds*, 377 U.S. at 577.

258.   Partisan motivations do not justify these deviations. Furthermore, partisanship would not be a legitimate state interest sufficient to justify the unequal voting strength between voters in the same cluster that are produced by this malapportionment. Excessive partisanship in redistricting is "incompatible with democratic principles," and

77

thus not a legitimate state purpose. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506 (2019) (quoting *Ariz. State Legislature*, 576 U.S. 787, 135 S. Ct. 2652 (2015)). While partisan gerrymandering itself is nonjusticiable, that conclusion "does not condone excessive partisan gerrymandering" in a way that could justify violations of Constitutional and statutory protections afforded voters, including to equal voting power. *Id.* at 2508.

259.    The 2023 Senate Plan violates the Equal Protection Clause's one-person one-vote principle because the deviations within Senate Districts 7 and 8, and Senate Districts 38 through 42, are arbitrary and discriminatory, and cannot be justified by adherence to any legitimate, consistently-applied state interest in redistricting. The 2023 Senate Plan therefore denies Individual Plaintiffs Hollis Briggs, Corine Mack, and members of the Organizational Plaintiffs their right to equal voting power under the Equal Protection Clause of the Fourteenth Amendment.

## Count 4
### Intentional vote dilution in violation of § 2 of the Voting Rights Act: 2023 Senate Plan

260.    Plaintiffs reallege and reincorporate by reference the allegations set forth above.

261.    The 2023 Senate Plan violates Section 2 of the Voting Rights Act because under the totality of the circumstances it has the purpose and effect of denying Black voters, including Individual Plaintiffs Hollis Briggs, Dawn Daly-Mack, Calvin Jones, Corine Mack, and members of the Organizational Plaintiffs, an equal opportunity to participate in the political process and elect representatives of their choice by diluting their voting strength. It does so, and was intended to do so, in the 2023 Senate Districts specified above.

78

262.     As set forth above, the General Assembly's failure to assess whether any senate districts are required by the Voting Rights Act prior to utilizing the county clusters in "Duke_Senate_04" constitutes a violation of both federal and state law under *Stephenson I*, 355 N.C. at 384.

263.     Plaintiffs have a right of action under Section 2 of the Voting Rights Act, 52 U.S.C. 101301 *et seq.*, as well as under 42 U.S.C. § 1983. *See Maine v. Thiboutot*, 448 U.S. 1 (1980).

## Count 5
### *Intentional discrimination in violation of the Fourteenth and Fifteenth Amendments: 2023 Senate Plan*

264.     Plaintiffs reallege and reincorporate by reference the allegations set forth above.

265.     The 2023 Senate Plan was enacted with the intent to discriminate on the basis of race as a motivating factor in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution by intentionally diminishing the voting power of Black voters and with the effect that these voters, including Individual Plaintiffs Hollis Briggs, Dawn Daly-Mack, Calvin Jones, Corine Mack, and members of the Organizational Plaintiffs, will have less of an opportunity to elect candidates of their choice.

## Count 6
### *Discriminatory Effects in Violation of § 2 of the Voting Rights Act: 2023 House Districts 4, 5, 7, 10, 12, 24, 25, 32*

266.     Plaintiffs reallege and reincorporate by reference the allegations set forth above.

267. The 2023 House Plan violates Section 2 of the Voting Rights Act because under the totality of the circumstances it has the effect of denying Black voters in North Carolina's Black Belt an equal opportunity to participate in the political process and elect representatives of their choice by diluting their voting strength.

268. Black voters in the Black Belt of North Carolina are sufficiently numerous to form a majority of the Black voting age population in at least six potential reasonably configured house districts that adhere to traditional redistricting criteria within clusters "S" (Vance/Granville/Franklin Counties), "DD" (Warren/Northampton/Halifax Counties), "X" (Edgecombe/Bertie/Martin Counties), "P" (Nash/Wilson Counties), "BB" (Greene/Lenoir/Jones Counties), "T" (Pitt County), "NN" (Hertford/Gates/Pasquotank/Camden Counties), and "KK" (Wayne/Duplin Counties), of "Duke_House_03," which is used in the 2023 House Plan. Black voters in North Carolina's Black Belt and in these six potential reasonably configured districts vote cohesively yet will be consistently blocked from electing candidates of their choice by white voters, who will vote sufficiently as a bloc to usually defeat the candidate of choice of Black voters in House Districts 5, 7, 10, 12, 24, 25, and 32.

269. Members of Organizational Plaintiffs are among the Black voters who will be denied an equal opportunity to participate in the political process leading to the election of state representatives as a result of the unlawful effect of the 2023 House Plan.

270. The General Assembly failed to assess, prior to using the county clusters in "Duke_House_03", whether any house districts were required by the Voting Rights Act. They did this despite receiving information that formed a strong basis in evidence that there

Case 1:23-cv-01104   Document 1   Filed 12/19/23   Page 80 of 87

exists racially polarized voting in North Carolina, and specifically in North Carolina's Black Belt, such that Black voters would be denied an opportunity to elect a candidate of choice or to participate equally on account of race. The General Assembly therefore violated the mandate set forth in *Stephenson I*, to draw VRA-required districts "prior to" complying with the North Carolina Constitution's Whole County Provision, as required under both federal and state law, 355 N.C. at 384, and where compliance with all legal requirements was otherwise possible. This failure to draw VRA districts first under *Stephenson* is inextricable from the Section 2 violation.

271.  Plaintiffs have a right of action under Section 2 of the Voting Rights Act, 52 U.S.C. 101301 *et seq.*, as well as under 42 U.S.C. § 1983. *See Maine v. Thiboutot*, 448 U.S. 1 (1980).

<u>**Count 7**</u>
*Malapportionment in Violation of the Fourteenth Amendment:*
*2023 House Plan*

272.  Plaintiffs reallege and reincorporate by reference the allegations set forth above.

273.  The 2023 House Plan violates the Equal Protection Clause's one-person one-vote principle because the deviations within House Districts 27 through 34, and House Districts 71, 72, 74, 75, and 91, are arbitrary and discriminatory, and cannot be justified by adherence to any legitimate, consistently-applied state interest in redistricting.

274.  The 2023 House Plan therefore denies Individual Plaintiffs Joan Chavis, Linda Sutton, and members of the Organizational Plaintiffs their right to equal voting power under the Equal Protection Clause of the Fourteenth Amendment.

81

## Count 8
### *Intentional vote dilution in violation of § 2 of the Voting Rights Act:*
### *2023 House Plan*

275.    Plaintiffs reallege and reincorporate by reference the allegations set forth above.

276.    The 2023 House Plan violates Section 2 of the Voting Rights Act because under the totality of the circumstances, it has the purpose and effect of denying Black voters, including Individual Plaintiffs Joan Chavis, Linda Sutton, and members of the Organizational Plaintiffs, an equal opportunity to participate in the political process and elect representatives of their choice by diluting their voting strength. It does so, and was intended to do so, in the 2023 House Districts specified above.

277.    As set forth above, the General Assembly's failure to assess whether any house districts are required by the Voting Rights Act prior to utilizing the county clusters in "Duke_House_03" constitutes a violation of both federal and state law under *Stephenson I*, 355 N.C. at 384.

278.    Plaintiffs have a right of action under Section 2 of the Voting Rights Act, 52 U.S.C. 101301 *et seq.*, as well as under 42 U.S.C. § 1983. *See Maine v. Thiboutot*, 448 U.S. 1 (1980).

## Count 9
### *Intentional discrimination in violation of the Fourteenth and Fifteenth Amendments:*
### *2023 House Plan*

279.    Plaintiffs reallege and reincorporate by reference the allegations set forth above.

280.    The 2023 House Plan was enacted with the intent to discriminate on the basis of race as a motivating factor in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution by intentionally diminishing the voting power of Black voters and with the effect that these voters, including Individual Plaintiffs Joan Chavis, Linda Sutton, and members of the Organizational Plaintiffs, will have less of an opportunity to elect candidates of their choice.

### Count 10
*Intentional vote dilution in violation of § 2 of the Voting Rights Act:*
*2023 Congressional District 1*

281.    Plaintiffs reallege and reincorporate by reference the allegations set forth above.

282.    2023 Congressional District 1 was drawn to intentionally dilute the voting power of Black voters in North Carolina's Black Belt.

283.    The 2023 Congressional Plan thus violates Section 2 of the Voting Rights Act because under the totality of the circumstances, it has the purpose and effect of denying Black voters, including Individual Plaintiffs Dawn Daly-Mack, Calvin Jones, Syene Jasmin, and members of the Organizational Plaintiffs, an equal opportunity to participate in the political process and elect representatives of their choice by diluting their voting strength.

284.    Plaintiffs have a right of action under Section 2 of the Voting Rights Act, 52 U.S.C. 101301 *et seq.*, as well as under 42 U.S.C. § 1983. *See Maine v. Thiboutot*, 448 U.S. 1 (1980).

## Count 11
### Intentional vote dilution in violation of § 2 of the Voting Rights Act:
### 2023 Congressional Districts 5, 6, 9, and 10

285.    Plaintiffs reallege and reincorporate by reference the allegations set forth above.

286.    2023 Congressional Districts 5, 6, 9, and 10 were drawn to intentionally dilute the voting power of Black voters in North Carolina's Triad area and deprive Black voters of any opportunity to elect a candidate of their choice in this area of the state.

287.    The 2023 Congressional Plan thus violates Section 2 of the Voting Rights Act because under the totality of the circumstances, it has the purpose and effect of denying Black voters, including Individual Plaintiff Mitzi Reynolds Turner and members of the Organizational Plaintiffs, an equal opportunity to participate in the political process and elect representatives of their choice by diluting their voting strength.

288.    Plaintiffs have a right of action under Section 2 of the Voting Rights Act, 52 U.S.C. 101301 *et seq.*, as well as under 42 U.S.C. § 1983. *See Maine v. Thiboutot*, 448 U.S. 1 (1980).

## Count 12
### Intentional discrimination in violation of the Fourteenth and Fifteenth Amendments:
### 2023 Congressional Plan

289.    Plaintiffs reallege and reincorporate by reference the allegations set forth above.

290.    The 2023 Congressional Plan was enacted with the intent to discriminate on the basis of race as a motivating factor in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution by intentionally diminishing the voting power of

84

Black voters and with the effect that these voters, including Individual Plaintiffs Dawn Daly-Mack, Calvin Jones, Syene Jasmin, Mitzi Reynolds Turner, and members of the Organizational Plaintiffs, will have less of an opportunity to elect candidates of their choice.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

1. Issue a declaratory judgment that North Carolina's 2023 Senate Plan (S.L. 2023-146) unlawfully dilutes the voting power of Individual Plaintiffs and members of the Organizational Plaintiffs by failing to provide at least two districts in North Carolina's Black Belt in which Black voters will have an opportunity to elect their candidate of choice in violation of Section 2 of the Voting Rights Act, was enacted with a discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act, does not comply with the Fourteenth Amendment's one-person one-vote principle, and used race as a predominating factor, subordinating traditional redistricting criteria to race without sufficient justification, in violation of the Fourteenth Amendment.

2. Issue a declaratory judgment that North Carolina's 2023 House Plan (S.L. 2023-149) unlawfully dilutes the voting power of Individual Plaintiffs and members of the Organizational Plaintiffs by failing to provide at least six districts in North Carolina's Black Belt in which Black voters will have an opportunity to elect their candidate of choice in violation of Section 2 of the Voting Rights Act, was enacted with a discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments and

Section 2 of the Voting Rights Act, and does not comply with the Fourteenth Amendment's one-person one-vote principle.

3. Issue a declaratory judgment that North Carolina's 2023 Congressional Plan (S.L. 2023-145), was enacted with a discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act.

4. Permanently enjoin Defendants from calling, holding, supervising, or certifying any elections under the 2023 Plans. Plaintiffs have no other adequate remedy at law other than the judicial relief sought herein and will be irreparably harmed through violation of their constitutional and statutory rights without this relief.

5. Issue an order setting forth a remedial process requiring, *inter alia*, the enactment of remedial redistricting plans sufficient to remedy the violations set forth herein in time for use no later than the 2026 general election and beyond; that Defendants and the General Assembly have the first chance to enact such plans, pursuant to N.C.G.S. § 120-2.4; and that such plans adhere to the prohibition on mid-decade redistricting within the North Carolina Constitution by changing only those districts required to remedy the violations alleged herein.

6. Award Plaintiffs their costs and reasonable attorneys' fees pursuant to Fed. R. Civ. P. 54, 42 U.S.C. § 1988, and 52 U.S.C. § 10310(e), and any other applicable provision providing such relief.

7. Issue an order retaining jurisdiction over this matter until the Defendants, their agents, employees, and those persons acting in concert with them have complied with all orders and mandates of this Court; and

8. Grant such other and further relief as it deems is proper and just.

Dated this 19th day of December, 2023.          Respectfully submitted,

*/s/ Hilary Harris Klein*

**HOGAN LOVELLS US LLP**

J. Tom Boer*
Corey Leggett*
Olivia Molodanof*
4 Embarcadero Center, Suite 3500
San Francisco, CA 94111
Telephone: 415-374-2300
Facsimile: 415-374-2499
tom.boer@hoganlovells.com
corey.leggett@hoganlovells.com
olivia.molodanof@hoganlovells.com

Jessica L. Ellsworth*
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: 202-637-5600
Facsimile: 202-637-5910
jessica.ellsworth@hoganlovells.com

Harmony Gbe*
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: 310-785-4600
Facsimile: 310-785-4601
harmony.gbe@hoganlovells.com

**SOUTHERN COALITION FOR SOCIAL JUSTICE**

Jeffrey Loperfido (State Bar # (52939)
Hilary Harris Klein (State Bar # 53711)
Christopher Shenton (State Bar #60442)
Mitchell D. Brown (State Bar # 56122)
5517 Durham Chapel Hill Blvd.
Durham, NC 27707
Telephone: 919-794-4213
Facsimile: 919-908-1525
hilaryhklein@scsj.org
jeffloperfido@scsj.org
chrisshenton@scsj.org
mitchellbrown@scsj.org

**NAACP**

Janette Louard*
Anna Kathryn Barnes Barry*
4805 Mt. Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5777
jlouard@naacpnet.org
abarnes@naacpnet.org

*Notices of Special Appearance Forthcoming*